## LAMOILLE COUNTY.

### April Term, 1840.

Present, Hon. CHARLES K. WILLIAMS, *Chief Justice,*
  " STEPHEN ROYCE,
  " ISAAC F. REDFIELD, } *Assistant Justices.*
  " MILO L. BENNETT.

### George Holmes, *Exparte.*

The Governor of this state is not authorized to surrender to the Governor of the province of Canada, on the request of the latter, a person who has committed a crime in that province and has escaped into this state, and a warrant, issued by the Governor of this state, to detain and surrender such person, does not authorize his arrest and imprisonment.

Habeas corpus, issued to the sheriff of Washington county, upon the petition of George Holmes, who was imprisoned in the common jail at Montpelier, in said county.

John Starkweather, sheriff of said county of Washington, and keeper in chief of said jail, in obedience to said writ, brought the said Holmes into court, and, in his return, stated that he held the said Holmes in custody by virtue of a warrant issued by the governor of this state, of which the following is a copy.

" State of Vermont.   To John Starkweather, Esq. sheriff " of Washington county.

" WHEREAS, George Holmes, late of Sorel, in the pro-
" vince of Lower Canada, is now detained in the common
" jail, in the county of Washington, and under your custody,
" by reason of a certain charge of felony, sustained by
" indictment found by the grand jury of the district of Que-
" bec, in said province, to wit, that the said George Holmes,
" on the 31st day of January, 1839, at the parish St. Louis
" of Kamouraska, in said district, did feloniously kill and
" murder one Louis Paschal Achille Tache; and whereas, the
" said George Holmes, not being a citizen of the state of
" Vermont, or of any of the United States, but a citizen of
" the said province of Lower Canada, and has come into this
" state from the said province of Lower Canada, and the of-
" fence whereof he is charged as aforesaid, having been
" committed within the jurisdiction of said province, it is fit
" and expedient that the said George be made amenable to
" the laws of said province, for the offence aforesaid.

" You are, therefore, hereby required, that as soon as may
" be, after the 27th day of April instant, the body of the said
" George Holmes, now in your custody, you convey and de-
" liver to William Brown, agent of Canada, or to such per-
" son or persons as, by the laws of said province, may be
" authorized to receive the said Holmes, at some convenient
" place on the confines of this state and the said province of
" Canada, to the end that he, the said George Holmes, may
" be thence conveyed to the said district of Quebec, and be
" there dealt with as to law and justice appertains. Hereof
" fail not, but of your doings in the premises make due re-
" turn.

" Given under my hand, at Shoreham, this 16th day of
" April, 1839.

S. H. JENISON,
Governor of Vermont."

And the said Starkweather, in his return, further stated,
that he was further directed by S. H. Jenison, Governor, to
append the following as a part of the order made on the
16th day of April, 1839.

" An application was made to me by Sir J. Colburn, go-
" venor general of Lower Canada, accompanied by a copy
" of an indictment v. Holmes for the crime of murder, and

" other evidence to substantiate the fact, and soliciting me, " that, in accordance with the comity which had heretofore " subsisted between the province of Canada and the state of " Vermont, that he, the said Holmes, might be surrendered " up to the authorities of Canada, as a fugitive from justice. " The final order was delayed at the solicitation of Holmes' " counsel, until the 16th day of April last, when the order " was made for the surrender of Holmes, and at the same " time I replied to the request of the governor of Canada, " apprising him that the surrender would be made agreeably " to the order."

(signed,)          S. H. JENISON,
                   Governor of Vermont.

At the term of this court, held at Montpelier, in the county of Washington, in July, 1839, the prisoner was brought before the court on a writ of *habeas corpus*, and the sheriff, in his return of that writ, stated that he held the said Holmes in custody by virtue of the warrant of the governor of this state, first above described. The case was then argued by C. P. Van Ness and J. Maeck, for the prisoner, and by C. Adams, *contra*. Upon that hearing the court decided that the prisoner was lawfully held in custody by the sheriff, by virtue of the warrant of the governor, and remanded the prisoner to the custody of the sheriff. A writ of error was then brought to the supreme court of the United States, to reverse that decision, and although no judgment was rendered in the case, by that court, yet, it is evident, from the report of the case, see 14 Peters' R. 540, that, had the record in that case contained that part of the order of the governor now appended to the original warrant, the decision of this court would have been reversed.

*C. P. Van Ness*, for the prisoner, at the present term, moved the court for an order that the prisoner be forthwith discharged from his imprisonment and detention, because it appeared, from the sheriff's return,

1. That the imprisonment or detention was contrary to the constitution and laws of this state.

2. That the imprisonment or detention, in the manner set forth, appeared to be under an agreement between this state and the British province of Lower Canada, for the surrender of the said Holmes, by the authorities of the former, to those

of the latter, contrary to the second clause of the tenth section and first article of the constitution of the United States.

3. That the imprisonment or detention appeared to be for the purpose of surrendering the said Holmes to the authorities of the British province of Lower Canada as a fugitive from justice, in violation, as the said Holmes conceived, of the constitution of the United States; the power over the subject of surrendering persons demanded by foreign governments, as fugitives from justice, being vested, by the constitution of the United States, exclusively in the federal government, and therefore could not be exercised by the authorities of this state.

After argument by *C. P. Van Ness*, for the prisoner,

The opinion of the court was delivered by

WILLIAMS, Ch. J.—George Holmes is brought before the court on a *habeas corpus*. The return shows that he is imprisoned by virtue of a warrant issued by the governor of this state. An amendment has been made to the order of the governor, since the case was before the court in Washington county in July last, in a very important particular, as will appear from the return of the sheriff. A motion is now made for the discharge of Holmes. When this application was heard last July, I was detained from the court by sickness and took no part in their deliberations, nor heard the arguments. It is a subject however which I had occasion to investigate partially, and came to a conclusion different from the views which were taken by a majority of the court, and I deem it proper, on this occasion, as it is a subject of great interest, to express my opinion upon the whole case and give the reasons which led me to express a doubt whether the power exercised by the executive of this state, in this instance, was warranted by the constitution and laws of this state. By the constitution of this state, it is provided that "no person can be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers", and every citizen of the United States who resides here a year and is of a quiet and peaceable behaviour, may become a freemen of this state. Whenever any person is to be transported out of this state, against his will, there must be found some legal authority therefor, or it will be an invasion of the right of personal security. The order

of the governor is founded upon the supposition that Holmes has committed a crime in the province of Canada, and is a fugitive from justice.

·. The subject of the surrender of fugitives from justice has been under examination and discussion so much, of late, that it has been nearly exhausted. Were there no other consequences attending upon the views I might take than what would affect the individual whose case is now before us, I should be very willing to have the order of the governor carried into effect. He is accused of a very atrocious and aggravated crime. If innocent, we have no reason to doubt he would so appear before the impartial and upright tribunals of justice where it is contemplated to send him for trial. If guilty, by the judgment of all civilized and christian nations, he is considered as having forfeited his life. These however are not questions on which we are to pass. We are neither to consider him guilty nor innocent. We are only to assume that such evidence of his guilt has been exhibited as would warrant his commitment for trial in the case of a crime committed here.

If the power of surrendering may be exercised in this case, it may, and must be, in all cases which can be brought within the principle which authorizes and dictates the surrender, and hence it becomes a question of great and important consideration, and involves consequences far beyond those affecting this individual.

If the governor possesses this power, it must be incident to his executive character as it is established by the constitution, because there is no statute of this state upon the subject. There are no powers incident to the executive character of a chief magistrate of this state, unless they are obviously necessary to carry into effect some of the powers expressly given. The extreme jealously with which the royal governors had been viewed, previous to the rovolution, and the powers which they claimed and exercised as the representatives of the king, led those who formed the American constitutions to define with accuracy the extent and nature of the functions of the executive, while they were willing to give almost unlimited power to the legislature. Restrictions on the legislature were not generally thought of, at the time, and they have been adopted since, rather from the construc-

tion of expressions which were probably designed to have a very limited effect, than from any thing expressly declared. In our constitution, while the supreme executive power is given to the governor, its extent is declared in another clause of the constitution. In relation to other states, he is only to correspond. In criminal jurisprudence, he can pardon, except in cases of murder where he can only reprieve. He may prepare such business as may appear to him necessary to lay before the general assembly, and may expedite the execution of such measures as may be resolved upon by them. He is to take care that the laws be faithfully executed. To the legislature, while extensive and general authority is delegated, there is also given " all the powers necessary " for the legislature of a free and sovereign state."

By the constitution of the United States, (Art. 4, Sec. 2,) fugitives from justice, escaping from one state to another, are required to be delivered up, on demand of the executive authority. This being the supreme law of the land, imperative on all executive and judicial officers, no legislative action is necessary to give it effect and none could prevent its obligation. With respect to persons guilty of crimes in a foreign government, there is no such duty directly imposed on the state or its officers.

If the power of removing such persons as have been guilty of atrocious crimes abroad is incident to the ordinary powers of a state to regulate its internal policy, and they may either prevent their entrance into their territory, or remove them therefrom, as they would vagrants or paupers, then, I apprehend, it is a power appertaining to the legislature and not to the executive, and if the legislature do not think proper to pass any law forbiding the entry, or for the removal of such persons as are dangerous to their safety, they may come here, and it is no part of the executive duty, nor is it competent for the executive to remove them.

As the legislature have not determined that the interest of the state required them to pass any law upon this subject, and have not passed any, we must look elsewhere than to our code of municipal laws for any regulation authorizing the governor to make the order in question. Hence, it has been considered that to demand and surrender fugitives from justice, who have been guilty of atrocious crimes, is a right

existing and a duty imposed, by the law of nations, and that Lamoille, *April,* 1840.
the constitution, requiring the governor to take care that the
laws be faithfully executed, required of him to make the sur-
render in the case before us.   The law of nations is binding    Holmes, *exparte.*
upon us, not as a part of the common law, as has been said,
nor because we have adopted the common law, for, if it was,
it would cease to be obligatory by a repeal of the statute
adopting it, or we might free ourselves from its operation by
the enactment of the legislature.   Whereas the law of na-
tions, which is the law of nature applied to nations " governs
us even against our will."  Martens, 2.   Nations are obliged to
respect them in all their proceedings. Vattel, 48.    " It is im-
mutable, and, as it is immutable, the obligations which arise
from it are necessary and indispensable."    " Nations can
neither make any changes in it by their conventions, dispense
with it themselves, nor reciprocally with respect to each other."
(p. 49.)    A neglect to perform a positive duty by one nation,
which the other has a right to exact, is a justifiable cause of
war.   The writers who have considered this as an obligation
have generally considered it as a perfect obligation, a refusal
to perform which renders the state or sovereign refusing
an accomplice in the injury and responsible.   Vattel, Grotius,
Heineccius and Burlemaqui contemplate it in this light.   The
observation of the court in the case of *East India Co.* v.
*Campbell*, 1 Vesey 246, that the government may send a per-
son to answer for a crime wherever committed, *that he may
not involve his country and to prevent reprisals*, is evident-
ly founded on the supposition that the duty of surrendering
was imperious.

It might be sufficient, in this part of the examination, to
stop here, with the remark that if the duty of extradition is
imposed by the law of nations, and the consequences are
such as have been stated, it must necessarily be a duty on the
general government and cannot be performed by the states,
as the latter cannot have jurisdiction of any questions which
may involve the peace of the country.

It has been contended, by other very eminent writers on
the law of nations, that the practice of delivering up crimin-
als exists, only, by the comity of nations, or by treaty, and
the refusal to perform it constitutes no ground of complaint
by one against the other.   Chancellor Kent asserts it to be a

LAMOILLE,
April,
1840.
———————
Holmes,
exparte.

matter of obligation. Lord Coke asserts that it is not. The assertion of either of these two great luminaries of the law " is like an arrow shot from a long bow, the force with which it strikes depends upon the strength of the arm that draws it," and were it not that they are in opposition to each other, they would come with an authority which could not be gainsayed nor resisted. Puffendorf and Martens do not consider it as a matter of right to require the surrender of criminals. Mr. Wheaton, in his treatise on national law, considers that no state is *bound*, unless by *special compact*, to deliver up persons, whether its own subjects or foreigners, charged with or convicted of crimes committed in another country. It is said extradition is no longer allowed in France, and I am inclined to believe it is now considered, in Europe, that the surrender of a fugitive is a matter of obligation. In this country with the exception of the case of *Washburn, exparte*, 4 John. Ch. R. 106, the weight of authority is against the position that this duty is imposed by the law of nations. *Commonwealth* v. *Deacon*, 10 Serg. & Rawle, 123. *Commonwealth* v. *Green*, 17 Mass. 515. The law of the provincial parliament of Lower Canada, under which the court of King's Bench discharged the person who was demanded by the governor of the state of New York and surrendered to him, and which law, as I understand, prevents any subject of the kingdom of Great Britain from being surrendered up, notwithstanding he may have come this side of the 45th degree of north latitude, and been guilty of the most atrocious crimes, is convincing that it is not considered there as a duty to surrender criminals. The weight of authority, the views entertained of the subject in this country, in Europe, and in the province of Canada, and the consideration that it has been thought expedient, if not necessary, to insert in the constitution of the United States a clause making it the duty of the states in the union to surrender those who have committed crimes in one of them and fled to another, and that it was thought necessary, in the treaty of 1794, between this country and Great Britain, to make a treaty stipulation on the subject, leads me to the conclusion that in no case is it a matter of obligation to surrender fugitives from justice, but that wherever it is practiced, it is either by treaty or by the comity of nations. And it must be obvious to any one that

LAMOILLE, April, 1840.

Holmes, exparte.

the effect of such an obligation would be utterly repugnant to many of those principles, and destructive of those rights, which have been considered as of the greatest importance, and which are deemed essential to the preservation of personal security. Not only those who seek the protection of our laws and an asylum under our liberal institutions, but our own citizens are liable to be sent abroad out of their country and deprived of a trial by jury, at the pleasure of a single individual, and on the demand of a foreign sovereign. The law of nations which would require us to surrender a person charged with crime, at the request of the governor of Canada, would equally require us to surrender on the demand of the executive of any foreign nation. Nor would the consequences be less extensive, fatal, and injurious by saying that the duty did not apply when the person demanded was charged with political offences. In all insurrections and rebellions, which are not so far successful as to be termed revolutions, persons are killed, and, in the eye of the law, if those who kill are acting against the government, they are deemed guilty of murder, and must be surrendered up for trial if found among us. The consequences of such a view are so disastrous, so much at variance with the rights, privileges and immunities of American citizens, that if the weight of authority was more forcible, I could not yield my assent to it, unless upon better reasons and more incontrovertible arguments than I have hitherto met with. If the practice of surrendering exists by comity only, and the sovereign of one state delivers up to another in expectation of a similar favor, and there were no constitutional objections to the exercise of this power by the state government, there would yet remain this formidable objection to the exercise of the power by the governor, that it is no where inscribed among the executive duties, by our constitution, to determine in what cases, for what offences, and with what nations this comity shall be observed. He is not the *sovereign power*, nor the representative of the sovereign power, except so far as he is made so by the constitution, and it would still be requisite for the legislature to pass a statute upon the subject, to determine the cases in which it might be exercised, the proof on which, and the tribunal by whom, it should be executed.

The governor is not, like the governor of Canada, invested with the powers which appertain to sovereignty.

There is still another question connected with this subject, whether the surrender be considered as in pursuance of an obligation, or from comity, and that is, whether it can be exercised by the authorities of any of the states in the union, or whether it must be exercised, if at all, by the general government? I approach this subject with great diffidence, and have not bestowed upon it that attention I should otherwise have done, if the view which I have already taken had not been satisfactory to me. I have already remarked that, if the right of demand and duty of surrender is one of perfect obligation, as it would involve the question of peace or war, it must necessarily be exercised by the general government. If it exists by the comity of nations, our *national* character belongs to the states collectively, as United States, and not to each separate state. But further, it appears to me that the exercise of a power to surrender criminals to, and demand them from, a foreign government, is expressly prohibited to the states in their separate character. The states are prohibited from making any treaty upon this, or any other subject. If it depends on comity or practice, it must be reciprocal. To ask a surrender of a criminal implies that we will surrender in a similar case. The cases in which, and the offences for which it is to be done, must be the subject of an agreement, either express or implied. A practice between two governments for the mutual advantage of each, to surrender persons charged with crimes, supposes a tacit agreement between them to that effect. A request from one to do a particular act, and a compliance with that request, is an agreement. And, in the very case before us, without the additional return, we must suppose the governor to have acted on the request of the governor of Canada, and in pursuance of a practice existing heretofore, or supposed to have existed, between the two governments, either of which would be evidence of an agreement between the governor of this state, in behalf of the state, and the governor of Canada. Now the states are forbidden, not only to make any treaty, but any compact or agreement with a foreign power. In this view it appears to me the power of surrendering cannot exist with the states, but, if it exists at all, it is with the gen-

eral government. In whatever light I have examined this subject, whether considering it as a subject belonging to the state, or to the general government, whether as a matter of police, national law, or comity, in the absence of any action of the legislature of this state, and without any statute law, either of congress or of the state legislature, and without any treaty stipulation imposing the duty, I am led to the conclusion that the warrant, under which Holmes is restrained of his liberty, was issued without authority, and that he is entitled to a discharge.

A different view was taken of this subject by a majority of the court, at their term in Washington county, in July last. I should have regarded their decision as settling the law upon this subject in this state, and, however strongly my opinion was to the contrary, I should have yielded to their decision as an authority in the case, and have agreed with them in remanding the prisoner, expressing these views rather as a dissenting opinion, if the case had now come before us presenting the same question, and only the same which was then presented. A different case is now presented, and on this we are all agreed. A writ of error was prosecuted from the judgment rendered by this court, and the case has been heard and determined by the supreme court of the United States, and from the opinions of the several judges, as delivered, we believe that, had the return been before that court as it now is before us, their decision would have been similar to the one we are about to make. The Chief Justice, and Justices Story, McLean, and Wayne, were of opinion that Holmes was entitled to his discharge and that the judgment of the supreme court of this state should be reversed. Justice Catron at first agreed with them, but came to the conclusion that the return did not show any demand made of the governor of the state, and that consequently no agreement existed. Had the return been as it now is, it is to be inferred, from his opinion, he would have concurred with the other justices, and the judgment of this court would have been reversed. Judge Thompson did not consider the case as coming within the 25th section of the judiciary act, so as to give the supreme court of the United States jurisdiction over the proceedings of this court, and, speaking of the question of surrendering to foreign governments

LAMOILLE
*April,*
1840.

Holmes,
*exparte.*

fugitives from justice, says, " If such a power or obligation, in the absence of any treaty or law of congress on the subject, rests any where, I should not be disposed to question its being vested in the President of the United States. It is a power essentially *national* in its character, and requires to be carried into execution by intercourse with a foreign government." He says again, " This power to surrender fugitives from justice, to a foreign government, has its *foundation,* its *very life and being in a treaty* to be made between the United States and such foreign government, and is not, by the constitution, vested in any department of government." He further remarked that there was no evidence that the state of Vermont had ever acted upon the subject, and there was no evidence of the governor's acting under the authority of any statute of this state, and that, if it was " an arbitrary exercise of power, without even the color of authority, it did not rest with this court to control or correct the exercise of such power." But, as the record did not show any question to have arisen or been decided, coming within the appellate power of the supreme court of the United States, and which they could re-examine, under the 25th section of the judiciary act of the United States, passed in 1789, he was for dismissing the writ of error. The question, whether any law or constitution of this state was violated, did not, nor could not come before that court. I am therefore authorized by my brethren to say, that, on an examination of the case, as decided by the supreme court of the United States, they think if the return had been as it now is, a majority of that court would have decided that Holmes was entitled to his discharge, and that the opinion of a majority of the supreme court of the United States was also adverse to the exercise of the power in question, by any of the separate states of the union. The judgment of the court therefore is, that Holmes be discharged from his imprisonment.

. The following opinion has been furnished the reporter by REDFIELD, J.—The history of this case is so peculiar that I feel justified in briefly stating the reasons which have induced me now to acquiesce in a decision, which I feel to be unjust and impolitic, if not dangerous to the peace of the

community, and which I cannot well reconcile with the fair
exposition of the acknowledged principles of the federal and
state governments of the American states.    Since the late
determination of this court upon this case, which was con-
trary to the one now declared, the case has been considered
by the supreme court of the United States, and the judgment
of this court virtually, although not formally, reversed.  From
the expressed opinions of the judges of that court, as read
at the bar, it is obvious that, had the record of this court
been in the form it now is, a judgment of reversal would
have been entered.  I should not, therefore, feel justified in
subjecting the relator, in this case, to delay and expense, and
above all, *unlawful* imprisonment, when his ultimate dis-
charge is certain.

But while I feel thus bound to bow before the authority of
the decision, because I esteem it the duty of every subordinate
officer or citizen to submit quietly to the honest and sincere
determination of all in authority over them, " for conscience
sake," I cannot but regard the grounds upon which that de-
cision is made as wholly fallacious and unsatisfactory.   It
could answer no good purpose to enter here into any labored
discussion of the reasons assigned for that decision.   That
decision will hereafter (I trust) be regarded as law, and thus
the uncertainty which has heretofore rested upon that impor-
tant subject, will be removed.  Still, I cannot but believe that
had the subject been more fully discussed in that court, it
might have received a different determination.   The reasons
which induce me to adopt this opinion, are briefly these.
Chief Justice Taney, who expresses the opinion of the
majority of that court, admits, on the very threshold of the
argument, that so far as concerns the punishment of crimes
or the regulation of internal police, the states have a right to
deal with fugitives from justice from foreign countries as they
deem meet and expedient.   It is there distinctly admitted,
that the state of Vermont might have passed a law subjecting
the relator in this case to punishment for the offence commit-
ted in the foreign jurisdiction.   I do not question this right
in any of the states.   It is one of the necessary incidents of
sovereignty.   A sovereign state may, if they see fit, even ex-
clude all immigration, and to effect this object, I do not ques-
tion they might subject any one, coming from a foreign ju-

risdiction to reside among them, even to the extreme penalty of death. And if they can do this in all cases, much more could they do it in the case of one confessedly guilty of the very last degree of crime.

But it seems to me that this concession upturns and overthrows the very basis upon which the whole superstructure of the argument rests. For, if the states can pass laws subjecting fugitives from justice to punishment, then, by parity of reason, they may punish the fugitive in any mode they see fit. They may subject him to death, or to imprisonment, or to fine, or to exile, or to transportation and exile. How then can it be said that while all this is a mere matter of internal police, that the expulsion of the fugitive in a given direction, and giving notice to the authorities from whence he made his escape, is " entering into a compact or agreement with the foreign state," and is therefore prohibited, by the terms of the constitution. The law of Vermont provides, that any fugitive from justice from any other state, may be surrendered to the executive of that state, on request made and proper proof of the offence committed. I speak of that as the settled law of this state, because such was the decision of a majority of this court. And although there is no statute to that effect, yet it had been so long acquiesced in by the people, and on one occasion, expressly recognized by the legislature, that we could not but consider it as the acknowledged law of the land. This rule of action, by the executive, was adopted at a very early day, not in consequence of any arrangement with the executive of Canada, or any other foreign state, for the reciprocation of this surrender of fugitives was understood, on all hands, to be merely discretionary and not obligatory in any sense, upon foreign powers. The obligation, then, which rested upon the executive of this state to surrender fugitives from justice, was not an obligation to any foreign state, or one which any foreign state could insist upon, but simply an obligation to the citizens of this state to execute the laws, and to see that intruders, as well as residents, who violated the laws, met their merited punishment. This was done, not because we wished to aid the foreign state in executing their laws, but to enforce our own, and thereby rid ourselves of such pestilent fellows as murderers and robbers, and the like. Whether other states reciprocated

the act was to us no matter of concern. If they could endure our vile wretches to live among them, we cared not, so long as we got rid of them, but we did not wish to keep theirs in exchange. And if, by this means, we obtained a surrender of our own fugitives, (which was the case,) this only enabled us to execute our own laws with more effect, since offenders could not escape punishment by merely passing into an adjoining state.

In this posture of affairs, the present relator, after having committed an atrocious and cold blooded murder, comes into this state to escape punishment. The executive of this state is applied to for his surrender, he refers the matter to the general government. They decline all interference, on the ground that, by the practical construction of their powers, too long acquiesced in to be now brought in question, they have no power to surrender fugitives from justice, unless when treaty stipulations exist upon the subject. Similar determinations had been made while Mr. Jefferson was secretary of state, and while Mr. Clay held that office. Congress had *never passed any laws upon the subject,* and it was controlled by *no treaty stipulations.* The governor of this state issued his warrant for the apprehension and surrender of the relator. He was brought, by *habeas corpus,* before this court, and the power of the governor to issue the warrant fully discussed and formally sustained.

Here then, without any interference on the part of the national government, the relator brings his writ of error, (a writ of error to the supreme court of the United States, to reverse the judgment of a state court on a *habeas corpus!*) and that judgment is virtually reversed at the instance of the relator.

I had supposed, at first, that this was, at most, a *dormant power* in the national government, and if so, its *existence* would not preclude the states from exercising the same power, to any extent, necessary to their own protection, unless that *exercise* came in conflict with the *laws* of the union. *City of New York* v. *Miln,* 11 Peters' R. 102. *Houston* v. *Moore,* 5 Wheaton, 1. *Sturgis* v. *Crowninshield,* 4 Wheaton, 122. *Ogden* v. *Saunders,* 12 do. 213. The language of the court is very explicit upon this point, in all the above

cases. It is admitted, too, that this power of surrendering fugitives from justice, and its constant exercise somewhere, is essential to the peace and quiet of the several states ; that its *existence* in the national government is not inconsistent with its *exercise* by the states ; that it is not, in terms, exclusively granted to congress. The only remaining ground, then, upon which it could be denied to the states, was, that it had been prohibited to them in the Unites States constitution. This prohibition, it is said, is found in that clause of the constitution, which provides that " No state shall enter into an *agreement* or *compact* with another state, or with a foreign power."

I may be permitted to say that the extending this prohibition to the case in hand, is going very far beyond the natural import of the terms used, or any necessary inference from them. A plain unsophisticated mind would find it difficult to construe that a " *compact or agreement,*" which was confessedly mere *comity,* and of course might be done or omitted at pleasure.

I regret, too, the result of this case in another particular. This very important power, which is acknowledged to exist somewhere, and the constant exercise of which is so important to the peace of the border states, is, by this decision, virtually annihilated. It is not for me to counsel my superiors. But it does seem that such a tribunal should have hesitated long before, upon an *exparte* hearing, they would have adopted principles so novel and at the same time so much to be dreaded in practice. What would a mere looker on say of this proceeding. The national government deny the existence of any such power in themselves, and congress make no provision for its exercise. The states attempt to exercise it for their own protection, and the national judiciary, at the instance of the offender, interfere and set him at liberty. Here is no conflict of powers, but a virtual denial of their existence or exercise.

It is to be borne in mind, too, that in extending that prohibition to the case of surrendering fugitives to foreign powers, we must, of course, declare state laws,regulating the surrender of fugitives to the other states of this union, equally unconstitutional, as, by the very terms of the constitution, the prohibition extends to the states of this union as well as foreign pow-

ers.  If congress had passed no laws, or should now repeal all laws upon that subject,the case would be the same.  How fearful then is the result to which the principle necessarily leads.  I cannot for a moment suppose the framers of the constitution ever intended that prohibition to extend to such a case ; and I confess I am averse to ingrafting grants or limitations upon any plain  provisions of the constitution, which bear no analogy to the original provisions.   I think it better, in the construction of written constitutions,  as in the case of statutes, or contracts, to follow the natural import of the terms used.

I would, at least, suffer the states to exercise their power, so indispensable to the regulation of their internal police and the execution of their own criminal laws, until congress made some provision for its exercise.   It seems unreasonable that murderers and robbers and vagabonds of every degree, should be permitted to thrust themselves upon us, and when we, in obedience to our own laws, attempt to expel them, we should be prevented, by some *dormant* power in the national government, which they refuse exercising for our relief, or by some constructive prohibition or limitation to which we  never understandingly assented.    But the decision is made, and even if it fill one land  with felons of the most daring character, we must abide the consequences, till we can obtain relief in some constitutional mode. I can only express my regret, that a majority of that  court should have found it  necessary to come to so undesirable a result.

BENNETT, J., who was present at the hearing, at the July term, 1839, in Washington county, when it was adjudged that the detention and imprisonment of George Holmes was good and  sufficient in law, and that he ought to be remanded and held under the governor's warrant, as set forth in the sheriff's return to the writ of *habeas corpus,* it is understood, dissented from that opinion, upon the ground, that whether the right or duty of surrendering fugitives from justice was created or imposed by the law of nations, or was dependant upon mere matter of comity between different governments, the exercise of the right belonged to the federal government as being necessarily involved in the foreign intercourse and treaty making power, and that it was incompatible that it should remain as a concurrent power in the state

governments, and must, from its very nature, belong exclusively to the general government, and that if the state government had the concurrent right to exercise this power with the general government, still the governor would have no right to call this power into exercise without some provision in the state constitution or an act of the legislature conferring upon him such right.