# UNITED STATES v. RAUSCHER.

CERTIFICATE OF DIVISION OF OPINION FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Submitted March 2, 1886. — Decided December 6, 1886.

Apart from the provisions of treaties on the subject, there exists no well-defined obligation on one independent nation to deliver to another fugitives from its justice; and though such delivery has often been made,

Opinion of the Court.

it was upon the principle of comity. The right to demand it has not been recognized as among the duties of one government to another which rest upon established principles of international law.

In any question of this kind which can arise between this country and a foreign nation, the extradition must be negotiated through the Federal government, and not by that of a State, though the demand may be for a crime committed against the law of that State.

With most of the civilized nations of the world with which the United States have much intercourse, this matter is regulated by treaties, and the question now decided arises under the treaty of 1842 between Great Britain and the United States, commonly called the Ashburton Treaty.

The defendant in this case being charged with murder on board an American vessel on the high seas, fled to England, and was demanded of the government of that country, and surrendered on this charge. The Circuit Court of the United States for the Southern District of New York, in which he was tried, did not proceed against him for murder, but for a minor offence not included in the treaty of extradition; and the judges of that court certified to this court for its judgment the question whether this could be done. *Held*:

(1) That a treaty to which the United States is a party is a law of the land, of which all courts, state and national, are to take judicial notice, and by the provisions of which they are to be governed, so far as they are capable of judicial enforcement.

(2) That, on a sound construction of the treaty under which the defendant was delivered to this country, and under the proceedings by which this was done, and acts of Congress on that subject, Rev. Stat. §§ 5272, 5275, he cannot lawfully be tried for any other offence than murder.

(3) The treaty, the acts of Congress, and the proceedings by which he was extradited, clothe him with the right to exemption from trial for any other offence, until he has had an opportunity to return to the country from which he was taken for the purpose alone of trial for the offence specified in the demand for his surrender. The national honor also requires that good faith shall be kept with the country which surrendered him.

(4) The circumstance that the party was convicted of inflicting cruel and unusual punishment on the same evidence which was produced before the committing magistrate in England, in the extradition proceedings for murder, does not change the principle.

The case is stated in the opinion of the court.

*Mr. Solicitor General Goode* for the United States.

*Mr. A. J. Dittenhoefer* for Rauscher submitted on his brief.

MR. JUSTICE MILLER delivered the opinion of the court.

This case comes before us on a certificate of division of opinion between the judges holding the Circuit Court of the United States for the Southern District of New York, arising after verdict of guilty, and before judgment, on a motion in arrest of judgment.

The prisoner, William Rauscher, was indicted by a grand jury, for that, on the 9th day of October, 1884, on the high seas, out of the jurisdiction of any particular state of the United States, and within the admiralty and maritime jurisdiction thereof, he, the said William Rauscher, being then and there second mate of the ship J. F. Chapman, unlawfully made an assault upon Janssen, one of the crew of the vessel of which he was an officer, and unlawfully inflicted upon said Janssen cruel and unusual punishment. This indictment was found under § 5347 of the Revised Statutes of the United States.

The statement of the division of opinion between the judges is in the following language:

" This cause coming on to be heard at this term, before judgment upon the verdict, on a motion in arrest of judgment, and also on a motion for a new trial before the two judges above mentioned, at such hearing the following questions occurred:

" First. The prisoner having been extradited upon a charge of murder on the high seas of one Janssen, under § 5339 Rev. Stat., had the Circuit Court of the Southern District of New York jurisdiction to put him to trial upon an indictment under § 5347 Rev. Stat., charging him with cruel and unusual punishment of the same man, he being one of the crew of an American vessel of which the defendant was an officer, and such punishment consisting of the identical acts proved in the extradition proceedings?

" Second. Did or not the prisoner, under the extradition treaty with Great Britain, having been surrendered upon a charge of murder, acquire a right to be exempt from prosecution upon the charge set forth in the indictment, without being first afforded an opportunity to return to Great Britain?

" Third. Was it error on the part of the trial judge to overrule a plea to the jurisdiction of the court to try the indictment

under § 5347 of the United States Revised Statutes, charging the accused with cruel and unusual punishment of one Janssen, one of the crew of a vessel of which accused was an officer, it having been established upon said plea that the accused was extradited under the extradition treaty with Great Britain, upon the charge of murder of the same Janssen, under § 5339 of the United States Revised Statutes?

"Fourth. Was it error on the part of the trial judge to refuse to direct a verdict of acquittal, after it had been proven that the accused was extradited under the extradition treaty with Great Britain, upon the charge of murder, it also appearing that in the proceedings preliminary to the warrant of extradition the same act was investigated, and the same witnesses examined, as at the trial?

"In respect to each of which questions the judges aforesaid were divided in opinion.

"Wherefore, at the same term, at the request of the United States attorney, they have caused the points above stated to be certified under the seal of this court, together with a copy of the indictment and an abstract of the record, to the Supreme Court of the United States for final decision according to law.

"Wm. J. Wallace.

"Chas. L. Benedict."

The treaty with Great Britain, under which the defendant was surrendered by that government to ours upon a charge of murder, is that of August 9, 1842, styled "A treaty to settle and define the boundaries between the territories of the United States and the possessions of Her Britannic Majesty in North America; for the final suppression of the African slave trade; and for the giving up of criminals, fugitive from justice, in certain cases." 8 Stat. 576.

With the exception of this caption, the tenth article of the treaty contains all that relates to the subject of extradition of criminals. That article is here copied, as follows:

"It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up

to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed; and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive."

Not only has the general subject of the extradition of persons charged with crime in one country, who have fled to and sought refuge in another, been matter of much consideration of late years by the executive departments and statesmen of the governments of the civilized portion of the world, by various publicists and writers on international law, and by specialists on that subject, as well as by the courts and judicial tribunals of different countries, but the precise questions arising under this treaty, as presented by the certificate of the judges in this case, have recently been very much discussed in this country and in Great Britain.

It is only in modern times that the nations of the earth have imposed upon themselves the obligation of delivering up these fugitives from justice to the States where their crimes were committed, for trial and punishment. This has been done generally by treaties made by one independent government with another. Prior to these treaties, and apart from them,

it may be stated as the general result of the writers upon international law, that there was no well-defined obligation on one country to deliver up such fugitives to another, and though such delivery was often made, it was upon the principle of comity, and within the discretion of the government whose action was invoked; and it has never been recognized as among those obligations of one government towards another which rest upon established principles of international law.

Whether in the United States, in the absence of any treaty on the subject with a foreign nation from whose justice a fugitive may be found in one of the States, and in the absence of any act of Congress upon the subject, a *State* can, through its own judiciary or executive, surrender him for trial to such foreign nation, is a question which has been under consideration by the courts of this country without any very conclusive result.

In the case of *Daniel Washburn*, 4 Johns. Ch. 106; *S. C.* 8 Am. Dec. 548, who was arrested on a charge of theft committed in Canada, and brought before Chancellor Kent upon a writ of *habeas corpus*, that distinguished jurist held that, irrespective of all treaties, it was the duty of a State to surrender fugitive criminals. The doctrine of this obligation was presented with great ability by that learned jurist; but shortly afterward Chief Justice Tilghman, in the case of *Short* v. *Deacon*, 10 S. & R. 125, in the Supreme Court of Pennsylvania, held the contrary opinion — that the delivery up of a fugitive was an affair of the executive branch of the national government, to which the demand of the foreign power must be addressed; that judges could not legally deliver up, nor could they command the executive to do so; and that no magistrate in Pennsylvania had the right to cause a person to be arrested in order to afford the President of the United States an opportunity to deliver him up, because the President had already declared he would not do so.

In the case of *Holmes* v. *Jennison*, 14 Pet. 540, on a writ of error to the Supreme Court of Vermont, it appears that application had been made to the President for the extradition of Holmes, a naturalized citizen of the United States, who was

charged with having committed murder in Lower Canada. There being then no extradition treaty between the two governments, the President declined to act, through an alleged want of power. Holmes having been arrested under authority from Governor Jennison, of Vermont, obtained a writ of *habeas corpus* from the Supreme Court of that State, and the sheriff returned that he was detained under an order of the governor, which commanded the sheriff to deliver him up to the authorities of Lower Canada, and the Supreme Court of the State held the return sufficient. On the writ of error from the Supreme Court of the United States two questions were presented, first, whether a writ of error would lie in such case from that court to the Supreme Court of the State; and, second, whether the judgment of the latter court was right. The eight judges who heard the case in this court were equally divided in opinion on the first of these questions, and therefore no authoritative decision of the principal question could be made. A very able and learned opinion in favor of the appellate jurisdiction of the Supreme Court of the United States, and against the right attempted to be exercised by the governor of Vermont, was delivered by Chief Justice Taney, with whom concurred Justices Story, McLean, and Wayne. Justices Thompson, Barbour, and Catron delivered separate opinions, denying the power of the Supreme Court of the United States to revise the judgment of the Supreme Court of Vermont. These latter, with whom concurred Justice Baldwin, did not express any clear opinion upon the power of the authorities of the State of Vermont, either executive or judicial, to deliver Holmes to the government of Canada; but, upon return of the case to the Supreme Court of that State, it seems that that court was satisfied by the arguments of the Chief Justice and those who concurred with him of the error of its position, and Holmes was discharged. In the final disposition of the case the court uses the following language:

" I am authorized by my brethren," says the Chief Justice, " to say, that, on an examination of this case, as decided by the Supreme Court of the the United States, they think, if the return had been as it now is, a majority of that court would have

decided that Holmes was entitled to his discharge, and that the opinion of a majority of the Supreme Court of the United States was also adverse to the exercise of the power in question by any of the separate States of the Union. The judgment of the court therefore is, that Holmes be discharged from his imprisonment." *Ex parte Holmes*, 12 Vt. 631.

The Court of Appeals of New York, in the case of *The People, &c.* v. *Curtis*, 50 N. Y. 321, also decided that an act of the Legislature of that State authorizing the rendition to foreign States of fugitives from justice was in conflict with the Constitution of the United States. This was in 1872.

The question has not since arisen so as to be decided by this court, but there can be little doubt of the soundness of the opinion of Chief Justice Taney, that the power exercised by the governor of Vermont is a part of the foreign intercourse of this country, which has undoubtedly been conferred upon the Federal government; and that it is clearly included in the treaty making power and the corresponding power of appointing and receiving ambassadors and other public ministers. There is no necessity for the states to enter upon the relations with foreign nations which are necessarily implied in the extradition of fugitives from justice found within the limits of the state, as there is none why they should in their own name make demand upon foreign nations for the surrender of such fugitives.

At this time of day, and after the repeated examinations which have been made by this court into the powers of the Federal government to deal with all such international questions exclusively, it can hardly be admitted that, even in the absence of treaties or acts of Congress on the subject, the extradition of a fugitive from justice can become the subject of negotiation between a state of this Union and a foreign government.

Fortunately, this question, with others which might arise in the absence of treaties or acts of Congress on the subject, is now of very little importance, since, with nearly all the nations of the world with whom our relations are such that fugitives from justice may be found within their dominions or within ours, we have treaties which govern the rights and conduct of

the parties in such cases.   These treaties are also supplemented by acts of Congress, and both are in their nature exclusive.

The case we have under consideration arises under one of these treaties made between the United States and Great Britain, the country with which, on account of our intimate relations, the cases requiring extradition are likely to be most numerous.   This treaty of 1842 is supplemented by the acts of Congress of August 12, 1848, 9 Stat. 302, and March 3, 1869, 15 Stat. 337, the provisions of which are embodied in §§ 5270, 5272, and 5275 of the Revised Statutes, under Title LXVI, Extradition.

The treaty itself, in reference to the very matter suggested in the questions certified by the judges of the Circuit Court, has been made the subject of diplomatic negotiation between the Executive Department of this country and the government of Great Britain in the cases of Winslow and Lawrence.   Winslow, who was charged with forgery in the United States, had taken refuge in England, and, on demand being made for his extradition, the Foreign Office of that country required a preliminary pledge from our government that it would not try him for any other offence than the forgery for which he was demanded.   To this Mr. Fish, the Secretary of State, did not accede, and was informed that the reason of the demand on the part of the British government was that one Lawrence, not long previously extradited under the same treaty, had been prosecuted in the courts of this country for a different offence from that for which he had been demanded from Great Britain, and for the trial of which he was delivered up by that government.   Mr. Fish defended the right of the government or state in which the offence was committed to try a person extradited under this treaty for any other criminal offence, as well as for the one for which the extradition had been demanded; while Lord Derby, at the head of the Foreign Office in England, construed the treaty as requiring the government which had demanded the extradition of an offender against its laws for a prescribed offence, mentioned in the treaty and in the demand for his extradition, to try him for that offence and for no other.   The correspondence is an able one upon both sides,

, and presents the question which we are now required to decide, ·, as to the construction of the treaty and the effect of the acts of Congress already cited, and of a statute of Great Britain of 1870 on the same subject. The negotiations between the two governments, however, on that subject were inconclusive in · any other sense than that Winslow was not delivered up and Lawrence was never actually brought to judgment for any other offence than that for which his extradition was demanded.

The question was also discussed in the House of Lords, and Lord Derby stated and defended his views of the construction of the treaty with marked ability, while he conceded that the act of Parliament on that subject, which declared that the person extradited could be tried for no other offence than that for which he had been demanded, had no obligatory force upon the United States as one of the parties to the treaty. Foreign Relations of the United States, 1876–7, pp. 204–307.

The subject was also very fully discussed by Mr. William Beach Lawrence, a very learned authority on matters of international law living in this country, in several published articles. Albany Law Journal, vol. 14, p. 85; vol. 15, p. 224; vol. 16, p. 361. In these the author, with his usual ability, maintains · the proposition, that a person delivered up under this treaty on a demand charging him with a specific offence, mentioned in it, can only be tried by the country to which he is delivered for that specific offence, and is entitled, unless found guilty of that, to be restored in safety to the country of his asylum at the time of his extradition.

A very able article arising out of the same public discussion at that time, to wit, 1876, is found in the American Law Review, said to have been written by Judge Lowell, of the United States Court at Boston, in which, after an examination of the authorities upon the general rule, independent of treaties, as found in the continental writers on international law, he says, that rule is, that the person whose extradition has been granted, cannot be prosecuted and tried except for the crime for which his extradition has been obtained; and, entering upon the question of the construction of the treaty of 1842, he gives to it the same effect in regard to that matter. 10 Am. Law Review, 1875–6, p. 617.

Mr. David Dudley Field, in his draft of an outline for an international code, published about the same time, adopts the same principle. Field's International Code, § 237, p. 122. It is understood that the rule which he lays down represents as well what he understands to be existing law, as also what he supposes it should be.

A very learned and careful work, published in this country by Mr. Spear, in 1879, and a second edition in 1884, after considering all the correspondence between our government and Great Britain upon the subject,. the debate in the House of Lords, the articles of Mr. Lawrence and Judge Lowell, as well as the treatise of Mr. Clarke, an English writer, with a very exhaustive examination of all the decisions in this country relating to this matter, arrives at the same conclusion. This examination by Mr. Spear is so full and careful, that it leaves nothing to be desired in the way of presentation of authorities.

The only English work on the subject of extradition we have been able to find which discusses this subject is a small manual by Edward Clarke of Lincoln's Inn, published in 1867. He adopts the same view of the construction of this treaty and of the general principles of international law upon the subject which we have just indicated.

Turning to seek in judicial decisions for authority upon the subject, as might be anticipated we meet with nothing in the English courts of much value, for the reason that treaties made by the Crown of Great Britain with other nations are not in those courts considered as part of the law of the land, but the rights and the duties growing out of those treaties are looked upon in that country as matters confided wholly for their execution and enforcement to the executive branch of the government. Speaking of the Ashburton treaty of 1842, which we are now construing, Mr. Clarke says, that, "in England the common law being held not to permit the surrender of a criminal, this provision could not come into effect without an Act of Parliament, but in the United States a treaty is as binding as an Act of Congress." Clarke on Extradition, 38.

This difference between the judicial powers of the courts of Great Britain and of this country in regard to treaties is thus

alluded to by Chief Justice Marshall in the Supreme Court of the United States:

"A treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is infra-territorial; but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established. Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the court." *Foster* v. *Neilson*, 2 Pet. 253, 314.

This whole subject is fully considered in the *Head Money Cases*, 112 U. S. 580, in which the effect of a treaty as a part of the law of the land, as distinguished from its aspect as a mere contract between independent nations, is expressed in the following language:

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or

inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress, by its declaration that 'this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is a law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute." pp. 598–9. See also *Chew Heong* v. *United States*, 112 U. S. 536, 540, 565.

The treaty of 1842 being, therefore, the supreme law of the land, which the courts are bound to take judicial notice of, and to enforce in any appropriate proceeding the rights of persons growing out of that treaty, we proceed to inquire, in the first place, so far as pertinent to the questions certified by the circuit judges, into the true construction of the treaty. We have already seen that, according to the doctrine of publicists and writers on international law, the country receiving the offender against its laws from another country had no right to proceed against him for any other offence than that for which he had been delivered up. This is a principle which commends itself as an appropriate adjunct to the discretionary exercise of the power of rendition, because it can hardly be supposed that a government which was under no treaty obligation nor any absolute obligation of public duty to seize a person who had found an asylum within its bosom and turn him over to another country for trial, would be willing to do this, unless a case was made of some specific offence of a character which justified the government in depriving the party of his asylum. It is unreasonable that the country of the asylum should be expected to deliver up such person to be dealt with by the demanding government without any limitation, implied or otherwise, upon its prosecution of the party. In exercising its

discretion, it might be very willing to deliver up offenders against such laws as were essential to the protection of life, liberty, and person, while it would not be willing to do this on account of minor misdemeanors or of a certain class of political offences in which it would have no interest or sympathy. Accordingly, it has been the policy of all governments to grant an asylum to persons who have fled from their homes on account of political disturbances, and who might be there amenable to laws framed with regard to such subjects, and to the personal allegiance of the party. In many of the treaties of extradition between the civilized nations of the world, there is an express exclusion of the right to demand the extradition of offenders against such laws, and in none of them is this class of offences mentioned as being the foundation of extradition proceedings. Indeed, the enumeration of offences in most of these treaties, and especially in the treaty now under consideration, is so specific, and marked by such a clear line in regard to the magnitude and importance of those offences, that it is impossible to give any other interpretation to it than that of the exclusion of the right of extradition for any others.

It is, therefore, very clear that this treaty did not intend to depart in this respect from the recognized public law which had prevailed in the absence of treaties, and that it was not intended that this treaty should be used for any other purpose than to secure the trial of the person extradited for one of the offences enumerated in the treaty. This is not only apparent from the general principle that the specific enumeration of certain matters and things implies the exclusion of all others, but the entire face of the treaty, including the processes by which it is to be carried into effect, confirms this view of the subject. It is unreasonable to suppose that any demand for rendition framed upon a general representation to the government of the asylum, (if we may use such an expression,) that the party for whom the demand was made was guilty of some violation of the laws of the country which demanded him, without specifying any particular offence with which he was charged, and even without specifying an offence mentioned in the treaty, would receive any serious attention; and yet such

is the effect of the construction that the party is properly liable to trial for any other offence than that for which he was demanded, and which is described in the treaty. There would, under that view of the subject, seem to be no need of a description of a specific offence in making the demand. But, so far from this being admissible, the treaty not only provides that the party shall be charged with one of the crimes mentioned, to wit, murder, assault with intent to commit murder, piracy, arson, robbery, forgery, or the utterance of forged paper, but that evidence shall be produced to the judge or magistrate of the country of which such demand is made, of the commission of such an offence, and that this evidence shall be such as according to the law of that country would justify the apprehension and commitment for trial of the person so charged. If the proceedings under which the party is arrested in a country where he is peaceably and quietly living, and to the protection of whose laws he is entitled, are to have no influence in limiting the prosecution in the country where the offence is charged to have been committed, there is very little use for this particularity in charging a specific offence, requiring that offence to be one mentioned in the treaty, as well as sufficient evidence of the party's guilt to put him upon trial for it. Nor can it be said that, in the exercise of such a delicate power under a treaty so well guarded in every particular, its provisions are obligatory alone on the State which makes the surrender of the fugitive, and that that fugitive passes into the hands of the country which charges him with the offence, free from all the positive requirements and just implications of the treaty under which the transfer of his person takes place. A moment before he is under the protection of a government which has afforded him an asylum from which he can only be taken under a very limited form of procedure, and a moment after he is found in the possession of another sovereignty by virtue of that proceeding, but divested of all the rights which he had the moment before, and of all the rights which the law governing that proceeding was intended to secure.

If upon the face of this treaty it could be seen that its sole

object was to secure the transfer of an individual from the jurisdiction of one sovereignty to that of another, the argument might be sound; but as this right of transfer, the right to demand it, the obligation to grant it, the proceedings under which it takes place, all show that it is for a limited and defined purpose that the transfer is made, it is impossible to conceive of the exercise of jurisdiction in such a case for any other purpose than that mentioned in the treaty, and ascertained by the proceedings under which the party is extradited, without an implication of fraud upon the rights of the party extradited, and of bad faith to the country which permitted his extradition. No such view of solemn public treaties between the great nations of the earth can be sustained by a tribunal called upon to give judicial construction to them.

The opposite view has been attempted to be maintained in this country upon the ground that there is no express limitation in the treaty of the right of the country in which the offence was committed to try the person for the crime alone for which he was extradited, and that once being within the jurisdiction of that country, no matter by what contrivance or fraud or by what pretence of establishing a charge provided for by the extradition treaty he may have been brought within the jurisdiction, he is, when here, liable to be tried for any offence against the laws as though arrested here originally. This proposition of the absence of express restriction in the treaty of the right to try him for other offences than that for which he was extradited, is met by the manifest scope and object of the treaty itself. The caption of the treaty, already quoted, declaring that its purpose is to settle the boundary line between the two governments; to provide for the final suppression of the African slave trade; adds, " and for the giving up of criminals, fugitive from justice, *in certain cases*." The treaty, then, requires, as we have already said, that there shall be given up, upon requisitions respectively made by the two governments, all persons charged with any of the seven crimes enumerated, and the provisions giving a party an examination before a proper tribunal, in which, before he shall be delivered up on this demand, it must be shown that the offence for which

he is demanded is one of those enumerated, and that the proof is sufficient to satisfy the court or magistrate before whom this examination takes place that he is guilty, and such as the law of the State of the asylum requires to establish such guilt, leave no reason to doubt that the fair purpose of the treaty is, that the person shall be delivered up to be tried for that offence and for no other.

If there should remain any doubt upon this construction of the treaty itself, the language of two acts of Congress, heretofore cited, incorporated in the Revised Statutes, must set this question at rest. It is there declared, Rev. Stat. § 5272, the two preceding sections having provided for a demand upon this country and for the inquiry into the guilt of the party, that "it shall be lawful for the Secretary of State, under his hand and seal of office, to order the person so committed to be delivered to such person or persons as shall be authorized, in the name and on behalf of such foreign government, *to be tried for the crime of which such person shall be so accused,* and such person shall be delivered up accordingly."

For the protection of persons brought into this country by extradition proceedings from a foreign country, § 5275 of the Revised Statutes provides:

"Whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any crime of which he is duly accused, the President shall have power to take all necessary measures for the transportation and safe keeping of such accused person, and for his security against lawless violence, until the final conclusion of his trial for the crimes or offences specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such crimes or offences, and for a reasonable time thereafter, and may employ such portion of the land or naval forces of the United States, or of the militia thereof, as may be necessary for the safe keeping and protection of the accused."

The obvious meaning of these two statutes, which have reference to all treaties of extradition made by the United

States, is that the party shall not be delivered up by this government to be tried for any other offence than that charged in the extradition proceedings; and that, when brought into this country upon similar proceedings, he shall not be arrested or tried for any other offence than that with which he was charged in those proceedings, until he shall have had a reasonable time to return unmolested to the country from which he was brought. This is undoubtedly a congressional construction of the purpose and meaning of extradition treaties such as the one we have under consideration, and whether it is or not, it is conclusive upon the judiciary of the right conferred upon persons brought from a foreign country into this under such proceedings.

That right, as we understand it, is that he shall be tried only for the offence with which he is charged in the extradition proceedings and for which he was delivered up, and that if not tried for that, or after trial and acquittal, he shall have a reasonable time to leave the country before he is arrested upon the charge of any other crime committed previous to his extradition.

This precise question has been frequently considered by courts of the highest respectability in this country. One of the earliest cases is that of *United States* v. *Caldwell*, 8 Blatchford, 131. Caldwell was extradited from Canada, in 1870, under the treaty of 1842 with Great Britain, charged with forgery. He was not tried for this offence, however, but was tried and convicted for bribing an officer of the United States — an offence not designated in that treaty. In the Circuit Court of the United States, held by Judge Benedict, Caldwell called the attention of the court to this fact, and claimed that under the treaty he could not be tried for any offence committed prior to his extradition other than the one charged in the proceedings. To this plea the government interposed a demurrer, which was sustained, and the prisoner was tried, convicted, and punished for the bribery. Judge Benedict said, that, "while abuse of extradition proceedings, and want of good faith in resorting to them, doubtless constitute a good cause of complaint between the two governments, such com-

plaints do not form a proper subject ou ..vestigation in the courts, however much those tribunals might regret that they should have been permitted to arise. . . . But whether extradited in good faith or not, the prisoner, in point of fact, is within the jurisdiction of the court, charged with a crime therein committed; and I am at a loss for even a plausible reason for holding, upon such a plea as the present, that the court is without jurisdiction to try him. . . . And I cannot say that the fact that the defendant was brought within the jurisdiction by virtue of a warrant of extradition for the crime of forgery affords him a legal exemption from prosecution for other crimes by him committed."

The next case, tried before the same court, was that of *United States* v. *Lawrence*, 13 Blatchford, 295. Lawrence was extradicted from Ireland and brought into this country under the treaty of 1842 on a charge of a single and specific forgery. He was indicted and put upon his trial for other forgeries than that specified in the extradition proceedings. To his trial for any other forgery than that he objected by proper pleadings, on the ground that under the treaty with Great Britain he could not be so tried for other forgeries. Judge Benedict held that he could be so tried, and he was tried and a verdict of guilty was rendered. It appears, however, but not very clearly from any report of the case, that, though tried and convicted, and having pleaded guilty to the other offences of forgery, he was admitted to bail and no judgment was ever pronounced. Judge Benedict, adverting to the case of *United States* v. *Caldwell*, and to a decision of the Court of Appeals of New York in *Adriance* v. *Lagrave*, 59 N. Y. 110, proceeded to say:

"This ground of defence is, therefore, dismissed, with the remark that an offender against the justice of his country can acquire no rights by defrauding that justice. Between him and the justice he has offended, no rights accrue to the offender by flight. He remains at all times, and everywhere, liable to be called to answer to the law for his violations thereof, provided he comes within the reach of its arm."

And in addition to the proposition urged in the Caldwell

case, that a question of that character arising on the treaty is exclusively for the consideration of the Executive Departments of the respective governments, he proceeds to say:

"It is true that it [the act of Congress] assumes, as well it may, that the offender will be tried for the offence upon which his surrender is asked, but there are no words indicating that he is to be protected from trial for all other offences. The absence of any provision indicating an intention to protect from prosecution for other offences, in a statute having no other object than the protection of extradited offenders, is sufficient to deprive of all force the suggestion that the act of 1869, as a legislative act, gives to the treaty of 1842 the construction contended for by the accused." There are perhaps two or three other cases in which the circuit or district judges of the United States have followed these decisions rendered by Judge Benedict.

On the other hand, Judge Hoffman, of the District Court of California, in the case of *United States* v. *Watts*, 8 Sawyer, 370, decided that the defendant, having been surrendered under the extradition treaty of 1842 by Great Britain, could not be tried for other offences than those enumerated in that treaty, and supported this view with a very learned and able opinion. Judge Deady, of the District Court of Oregon, in *Ex parte Hibbs*, 26 Fed. Rep. 421, 431, February 4, 1886, held, in regard to the treaty of 1842, that for a government to detain a person extradited under that treaty for any other charge than the one for which he had been surrendered, "would be not only an infraction of the contract between the parties to the treaty, but also a violation of the supreme law of this land in a matter directly involving his personal rights. A right of person or property, secured or recognized by treaty, may be set up as a defence to a prosecution in disregard of either, with the same force and effect as if such right was secured by an act of Congress."

But perhaps the most important decisions on this question are to be found in the highest courts of the states.

The case of *Adriance* v. *Lagrave*, 59 N. Y. 110, has been cited as supporting the doctrine held by Judge Benedict, and

undoubtedly the language of the opinion delivered by Chief
Justice Church, for the court, in that case, adopts the reason-
ing of Judge Benedict's opinion. Considering the high char-
acter of that court, it may be proper to make an observation
or two on that case. First. It seems that while Lagrave was
held for trial in this country under extradition proceedings, by
which he was removed from France under the treaty of 1843
with that nation, being out on bail, he was arrested under a
writ in a civil suit for debt, which issued from one of the
courts of the State of New York. He made application by a
writ of *habeas corpus* to be released from this arrest, on the
ground that he was protected from it by the terms of the
treaty under which he was surrendered, which, in that respect,
are similar to those of the treaty of 1842 with Great Britain.
The difference between serving process in a civil action brought
by a private party, whether arrest be an incident to that
process or not, and the indictment and prosecution of a person
similarly situated for a crime not mentioned in the treaty of
extradition under which the defendant was by force brought
to this country, is too obvious to need comment. And while
it is unnecessary to decide now whether he could be so served
with process in civil proceedings, it does not follow that he
would be equally liable to arrest, trial, and conviction for
a crime; and especially a crime not enumerated in the extra-
dition treaty, and committed before his removal. Second.
The case of *Adriance* v. *Lagrave* was decided in the Supreme
Court of the State by an order discharging Lagrave from
arrest under the writ, and the writ was vacated. This judg-
ment was the unanimous opinion of the court, in which sat
three eminent judges of that State, to wit, Daniels, Davis, and
Brady. In the Court of Appeals this judgment was reversed
by a divided court, Judges Folger and Grover dissenting.

While this is believed to be the only decision in the highest
court of a state adopting that view of the law, there are three
or four cases decided by appellate courts of other states, hold-
ing a directly opposite doctrine.

The first of these is *Commonwealth* v. *Hawes*, 13 Bush, 697.
Hawes was demanded from the Dominion of Canada under

the treaty of 1842 on four indictments charging him with as many acts of forgery, and was delivered up on three of them. He was brought to trial on two of these indictments in the courts of Kentucky and acquitted, while the other two were dismissed on motion of the attorney for the commonwealth. There were, however, other indictments pending against him, charging him with embezzlement, and on one of these a motion was made to bring him to trial. Upon this motion the question was raised whether, under the circumstances in regard to the extradition, he could be tried for that offence. Judge Jackson, before whom the case was pending in the Kenton County Criminal Court, decided that he was bound to take judicial notice of the treaty of 1842 between the United States and Great Britain, and that the defendant could not be tried for any offence for which he was not extradited, although he was within the power of the court, as the treaty was the supreme law of the land. By the terms of that treaty he held that Hawes could be tried for no other offence, because that treaty provides only for extradition in certain cases, and under certain circumstances of proof, and that the right of asylum is to be held sacred as to anything for which the party was not and could not be extradited. He adds:

"I do not mean to say that he [Hawes] may not hereafter be tried; but what I mean to say is, that in the face of the treaty herein referred to, he is not to be tried until there is a reasonable time given him to return to the asylum from which he was taken."

The case was carried to the Court of Appeals of Kentucky, in which the whole matter was fully discussed, the opinion of the court, a very able one, being delivered by Chief Justice Lindsay, in 1878. The substance of the opinion is thus stated in the syllabus:

"1. Extradited criminals cannot be tried for offences not named in the treaty, or for offences not named in the warrant of extradition. A prisoner extradited from the Dominion of Canada under Art. 10 of the treaty of 1842 between the United States and Great Britain, cannot be proceeded against or tried in this State for any other offences than those mentioned in

the treaty, and for which he was extradited, without first being afforded an opportunity to return to Canada; and, after being acquitted on trials for the offences for which he was extradited, he cannot be lawfully held in custody to answer a charge for which he could not be put on trial."

"3. The right of one government to demand and receive from another the custody of an offender who has sought asylum upon its soil, depends upon the existence of treaty stipulations between them, and in all cases is derived from, and is measured and restricted by, the provisions, express or implied, of the treaty."

In 1881 a case involving the same question came before the Texas Court of Appeals, *Blandford* v. *State*, 10 Tex. Ct. of App. 627, in which the same principles were asserted as in that of Hawes. The case seems to have been very well considered, and the authorities up to that date were fully examined.

In 1883 the same question came before the Supreme Court of Ohio, in *State* v. *Vanderpool*, 39 Ohio St. 273. Vanderpool and Jones having been delivered up under the treaty of 1842 by the Dominion of Canada for offences specified in that treaty, were tried, convicted, and sentenced to the penitentiary for the crimes for which they were extradited. They were afterwards indicted for other offences, to which they pleaded in abatement that by reason of the facts already stated they could not be tried for these latter offences until a reasonable time had elapsed after the expiration of their sentences for the crimes of which they had been convicted. The Supreme Court of Ohio, to which the case came on appeal from the judgment of the Court of Common Pleas, sustained this view, and this was done upon the same general reasoning, already stated, as to the construction to be placed upon the Ashburton treaty, of the obligations of that treaty as a law of the land; and of the rights conferred upon the party who was arrested and extradited under its provisions.

Upon a review of these decisions of the Federal and State courts, to which may be added the opinions of the distinguished writers which we have cited in the earlier part of this

opinion, we feel authorized to state that the weight of authority and of sound principle are in favor of the proposition, that a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings.

Two other observations remain to be made. One of these is, that the operation of this principle of the recognition of the rights of prisoners under such circumstances by the courts before whom they are brought for trial, relieves the relations between the Executive Department of the United States government and the courts of a state before whom such case may be pending, of a tension which has more than once become very delicate and very troublesome. Of course, the interference of the executive branch of the Federal government, when it may have been called upon by the nation which has delivered up a person to be tried for an offence against the laws of a state, with the proceedings of a state court in such case, is likely to be resented by such court, and yet, if the only mode of enforcing the obligations of the treaty is through the action of the respective national governments, it would seem that the government appealed to ought to have the right to see that the treaty is faithfully observed, and the rights of parties under it protected. In Great Britain the control of such matters would undoubtedly be recognized by any court to be in the Crown, but in this country such a proposition is, to say the least, not unaccompanied by serious embarrassments. The principle we have here laid down removes this difficulty, for under the doctrine that the treaty is the supreme law of the land, and is to be observed by all the courts, state and national, " anything in the laws of the states to the contrary notwithstanding," if the state court should fail to give due effect to the rights of the party under the treaty, a remedy is found in the judicial branch of the Federal government, which has been

fully recognized. This remedy is by a writ of error from the Supreme Court of the United States to the state court which may have committed such an error. The case being thus removed into that court, the just effect and operation of the treaty upon the rights asserted by the prisoner would be there decided. If the party, however, is under arrest and desires a more speedy remedy in order to secure his release, a writ of *habeas corpus* from one of the Federal judges or Federal courts, issued on the ground that he is restrained of his liberty in violation of the Constitution or a law or a treaty of the United States, will bring him before a Federal tribunal, where the truth of that allegation can be inquired into, and, if it be well founded, he will be discharged. *Ex parte Royall*, 117 U. S. 241, 251. State courts also could issue such a writ, and thus the judicial remedy is complete, when the jurisdiction of the court is admitted. This is a complete answer to the proposition that the rights of persons extradited under the treaty cannot be enforced by the judicial branch of the government, and that they can only appeal to the executive branches of the treaty governments for redress.

The other observation we have to make regards an argument presented in this particular case; namely, that the prisoner was convicted on the same testimony which was produced before the magistrate who ordered his extradition. Although it is thus stated in the brief, the record affords no sufficient evidence of it. What is found on that subject in the fourth question certified to this court is as follows:

" Was it error on the part of the trial judge to refuse to direct a verdict of acquittal, after it had been proven that the accused was extradited under the extradition treaty with Great Britain, upon the charge of murder, it also appearing that in the proceedings preliminary to the warrant of extradition the same act was *investigated*, and the same *witnesses* examined, as at the trial ? "

It might be a sufficient answer to this argument to say that this does not prove that the *evidence* was the same upon the two trials. Although the act charged may have been the same and the witnesses may have been the same, yet the evi-

dence elicited on the last trial may have been very different from that obtained on the first. While the identity of facts investigated in the two trials is charged a little more specifically in the first question, we are of opinion that no importance should be attached to this matter, even if it were found that the party was convicted of inflicting cruel and unusual punishment on the seaman on the same evidence precisely upon which the committing magistrate in Great Britain delivered him up under a charge of murder. It may be very true that evidence which satisfied that officer that the prisoner was guilty of the crime of murder would also establish that he had inflicted cruel and unusual punishment on the person for whose murder he was charged; but, as the treaty only justified his delivery on the ground that he was proved to be guilty of murder before the committing magistrate, it does not follow at all that such magistrate would have delivered him on a charge, founded upon precisely the same evidence, of inflicting cruel and unusual punishment, an offence for which the treaty made no provision, and which was of a very unimportant character when compared with that of murder. If the party could be convicted on an indictment for inflicting cruel and unusual punishment where the grand jury would not have found an indictment for murder, the treaty could always be evaded by making a demand on account of the higher offence defined in the treaty, and then only seeking a trial and conviction for the minor offence not found in the treaty. We do not think the circumstance that the same evidence might be sufficient to convict for the minor offence which was produced before the committing magistrate to support the graver charge justifies this departure from the principles of the treaty.

This fourth question may also properly be treated as immaterial, for the question is, should the trial judge have directed a verdict of acquittal? As all the matters set up by the defendant are in the nature of pleas in abatement, going rather to the question of trial on that indictment at that time, and not denying that at some future time, when the defendant may have been properly brought within the jurisdiction of the court, or rightfully found within such jurisdiction, he may

be then tried, it did not involve an issue on the question of guilty or not guilty on which the court, if it proceeded to try that question at all, could direct either an acquittal or a conviction. Under the views we have taken of the case the jurisdiction of the court to try such an offence, if the party himself was properly within its jurisdiction, is not denied, but the facts relied upon go to show that while the court did have jurisdiction to find the indictment, as well as of the questions involved in such indictment, it did not have jurisdiction of the person at that time, so as to subject him to trial. The question therefore is immaterial.

The result of these considerations is, that the first of the questions certified to us is answered in the negative; the second and third are answered in the affirmative; and it is ordered to be so certified to the judges of the Circuit Court.

Mr. Justice Gray concurring.

I concur in the decision of the court, upon the single ground, that by the act of Congress of March 3, 1869, c. 141, § 1, (embodied in § 5275 of the Revised Statutes,) providing measures by which any person, delivered up by a foreign government for the purpose of being tried here for a crime of which he has been accused, may be secured against lawless violence "until the final conclusion of his trial for the crimes or offences specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such crimes or offences, and for a reasonable time thereafter," the political department of the government has clearly manifested its will, in the form of an express law, (of which any person prosecuted in any court within the United States has the right to claim the protection,) that the accused shall be tried only for the crime specified in the warrant of extradition, and shall be allowed a reasonable time to depart out of the United States, before he can be arrested or detained for another offence.

Upon the broader question whether, independently of any act of Congress, and in the absence of any affirmative restriction in the treaty, a man surrendered for one crime should

be tried for another, I express no opinion, because not satisfied that that is a question of law, within the cognizance of the judicial tribunals, as contradistinguished from a question of international comity and usage, within the domain of statesmanship and diplomacy.

MR. CHIEF JUSTICE WAITE dissenting.

I am unable to concur in the decision of this case. A fugitive from justice has no absolute right of asylum in a country to which he flees, and if he can be got back within the jurisdiction of the country whose laws he has violated, he may be proceeded with precisely the same as if he had not fled, unless there is something in the laws of the country where he is to be tried, or in the way in which he was got back, to prevent. I do not understand this to be denied. All, therefore, depends in this case on the treaty with Great Britain under which this extradition was effected, and § 5275 of the Revised Statutes. I concede that the treaty is as much a part of the law of the United States as is a statute; and if there is anything in it which forbids a trial for any other offence than that for which the extradition was made, the accused may use it as a defence to a prosecution on any other charge until a reasonable time has elapsed after his release from custody on account of the crime for which he was sent back. But I have been unable to find any such provision. The treaty requires a delivery up to justice, on demand, of those accused of certain crimes, but says nothing about what shall be done with them after the delivery has been made. It might have provided that they should not be tried for any other offences than those for which they were surrendered, but it has not. Consequently, as it seems to me, the accused has acquired no new rights under the treaty. He fled from the justice of the country whose laws he violated, and has been got back. The treaty under which he was surrendered has granted him no immunity, and therefore it has not provided him with any new defence. This seems to have been the view taken by the English government during the time of the controversy growing out of the demand made

for the extradition of Winslow; for, in the debate in the House of Lords, the Lord Chancellor (Cairns), while supporting the English view of the matter, and referring to the cases which had been cited against it, said: "In that class of cases . . . the prisoners, who had been surrendered on one charge, and who were being tried upon another, themselves attempted to raise the defence that they could not be tried for an offence different from that for which they had been surrendered. Such cases certainly have no application whatever to the present question, because nothing can be more clear than that a prisoner himself has no right to raise such a defence. Even in France, where . . . the law and practice of extradition goes far beyond that which prevails in this country and in the United States, a prisoner is not permitted to set up such a defence, for the clear reason that he is within the jurisdiction of the court, which has the authority to try him for the offence of which he is charged, and that whether he ought to be tried for an offence other than that for which he has been surrendered is a matter of diplomacy between the two countries, and not a question between the prisoner and the court before which he is being tried." Foreign Relations of the United States, 1876, 291.

This is, I think, the true rule, and it is in full accord with the principles applied by this court in *The Richmond*, 9 Cranch, 102, where it was insisted upon by way of defence that a vessel proceeded against for a violation of the non-intercourse act had been seized within the territorial jurisdiction of Spain. As to this, Chief Justice Marshall said, in delivering the opinion of the court: "The seizure of an American vessel within the territorial jurisdiction of a foreign power is certainly an offence against that power, which must be adjusted between the two governments. This court can take no cognizance of it; and the majority of the court is of opinion that the law does not connect that trespass, if it be one, with the subsequent seizure by the civil authority, under the process of the District Court, so as to annul the proceedings of that court against the vessel." If either country should use its privileges under the treaty to obtain a surrender of a fugitive on the

pretence of trying him for an offence for which extradition could be claimed, so as to try him for one for which it could not, it might furnish just cause of complaint on the part of the country which had been deceived, but it would be a matter entirely for adjustment between the two countries, and which could in no way enure to the benefit of the accused except through the instrumentality of the government that had been induced to give him up.

As to § 5275 of the Revised Statutes I have only to say that, in my opinion, it neither adds to the rights of the accused nor changes the effect of the treaty as a part of the law of the United States. The accused was surrendered by Great Britain to the United States, and the United States are alone responsible to that country for whatever may be done with him in consequence of his surrender. He was delivered into the possession of the United States, and, in my opinion, that possession may at any time be regained by the United States under this statute from the State, or its authorities, so long as the accused remains in custody, if it should be necessary in order to enable them to keep their faith with Great Britain in respect to the surrender.

I do not care to elaborate the argument on either of these questions. My only purpose is to state generally the grounds of my dissent.