**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ruksana DIWAN, Defendant–Appellant.**

**No. 87–3861.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 30, 1989.

David T. Weisbrod, Tampa, Fla., for defendant-appellant.

Ann Frances Carpini, Asst. U.S. Atty., Tampa, Fla., Karen Skrivseth, Criminal Div.-App. Sect., Washington, D.C., for plaintiff-appellee.

Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

**PER CURIAM:**

Found guilty of mail fraud and conspiracy, Ruksana Diwan appeals, asserting as grounds for reversal: (1) that the indictment does not allege that the scheme to defraud caused a deprivation of money or property within the meaning of the mail fraud statute; and (2) that the district court lacked the requisite personal jurisdiction to enter a judgment of conviction on Count I of the indictment, the conspiracy count. Finding no merit in either of these contentions, we affirm.

## I.

Diwan pleaded guilty to all counts of an indictment charging her with an 18 U.S.C. § 371 conspiracy to persuade a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct, in violation of 18 U.S.C. § 2251,[1] and with eighteen incidents of mail fraud, each in violation of 18 U.S.C. § 1341.[2] The plea was entered conditionally pursuant to Fed.R.Crim.P. 11(a)(2); Diwan specifically reserved the right to appeal the district court's denial of her motion to dismiss the indictment, which raises the issues that this court will address forthwith.

At the Fed.R.Crim.P. 11 hearing, the government recounted the evidence that would come to light if the case proceeded to trial. Briefly, Diwan, together with Mervyn Harold Cross and Robert Carter

---

**1.** 18 U.S.C. § 2251 (1984) provides in pertinent part:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d), if such person knows or has reason to know that such visual depiction has actually been transported in interstate or foreign commerce or mailed.

**2.** 18 U.S.C. § 1341 (1984) provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Lodge,[3] established an elaborate facade to obtain photographs of nude, pre-adolescent girls. The purpose of this contrivance was to gratify the deviate sexual yearnings of Cross and Lodge. Under the rouse of producing a television documentary, preliminarily entitled "Susan's Magic Carpet," Cross contacted the Burn's Talent Agency, at times by letters delivered by employees of the United States Postal Service, seeking eight to eleven year old girls to audition for the title role in the film. Susan's carpet was to travel to certain countries of the world where nudity is an integral part of the culture. In order to accurately portray life in these countries, there would have to be scenes of Susan unclothed. Susan could not be shy. Accordingly, Cross told the Burn's Agency that he wanted the aspiring young actresses photographed in the nude. One could not, after all, be seen in a Turkish bath or Swedish sauna fully clothed. Burn's was promised a commission of ten percent.

The Burn's Agency contacted the mothers of several girls it thought might be interested in such a role. Diwan and Cross also contacted these mothers via the United States mail. The letters promised that the girl selected to portray Susan, and her mother, would receive substantial income and the opportunity to travel the world, all expenses paid. Also explained were the scenes involving nudity, the requirement that the girls not be modest, and the need for nude photographs as part of the audition.

Thereafter, the co-conspirators contacted photographer Dean Cason, at least once by mail, about photographing the girls auditioning for the roles in "Susan's Magic Carpet." Arrangements were made and the pictures were taken. Diwan delivered the pictures to Cross, who shared them with others, and, later, to Lodge.

Throughout the planning and implementation of this scheme, Cross was an inmate in the Florida prison system; he was serving a twenty-eight year sentence for a conviction involving lewd acts with a child. In order to facilitate Cross' communication with the outside world, Diwan obtained call forwarding and conference call services on her personal phone in St. Petersburg. Cross would phone Diwan, collect, and Diwan would phone the desired third party, making a connection between Cross and the unsuspecting conversant. She also received mail for Cross, smuggling it into the prison whenever necessary. Thus, the victims of this offense never knew that they were dealing with a devious inmate rather than a legitimate film producer.

## II.

Diwan raises two issues. Initially, she asserts that the indictment is deficient in that the paragraphs charging mail fraud do not state an offense under § 1341. Specifically, Diwan argues that the indictment fails to allege that the scheme to defraud involved a deprivation of money or property, which is a necessary element of the crime under the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We are unpersuaded by this argument.

The rule of law discernible from *McNally* is that the mail fraud statute does not apply to schemes to defraud citizens of their intangible right to honest government. *Id.* 107 S.Ct. at 2879. But, in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), a unanimous Court clarified *McNally*, opining that § 1341 is applicable to schemes designed to defraud a victim of intangible property rights. *Id.* 108 S.Ct. at 320. Thus, "the only fraudulent schemes exempt from the mail fraud statute are those involving intangible, non-property, non-monetary rights." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1569 (11th Cir.1988).

Does the conspiracy involved in this case fall within *McNally's* proscription? To answer this question, we must consider the

---

3. Following a joint trial by jury, Cross was convicted on the conspiracy and the mail fraud counts to which Diwan subsequently pleaded guilty, plus one count of distributing child pornography, in violation of 18 U.S.C. § 1461. Lodge was convicted on the conspiracy count only.

language of the indictment. *Id.* at 1570. If it is phrased in such a way that it *must* be concluded that Diwan schemed to defraud the victims of monetary or property rights, whether tangible or intangible, then the convictions stand. Conversely, if it *could* be concluded from the indictment that Diwan conspired to defraud the victims of a *McNally*-type intangible right, reversal must follow. *Id.* at 1570-71. Diwan argues that the indictment does not allege that the scheme involved a deprivation of money or property; rather, it merely states that the intent of the scheme was to satiate the personal sexual desires of Cross and Lodge, which, so the argument goes, is no more than an intangible consideration outside the reach of § 1341.

We turn to the indictment, which, in this case, charges that:

1. From in or about October of 1980, and continuing thereafter until in or about May of 1983, in the Middle District of Florida and elsewhere, the Defendants,

MERVYN HAROLD CROSS

a/k/a ERIC CROSS

ROBERT CARTER LODGE,

and

RUKSANA DIWAN,

and others known and unknown to the grand jury having knowingly and wilfully devised and intended to devise a scheme and artifice to defraud did knowingly cause to be delivered by mail according to the direction thereon a writing for the purpose of executing said scheme and artifice to defraud.

2. As part of said scheme and artifice to defraud the Defendant Mervyn Harold Cross represented himself to be a movie producer who was searching for pre-adolescent females to play a starring role in a television or movie production.

3. It was further a part of said scheme and artifice to defraud that the Defendant Mervyn Harold Cross with the assistance of the Defendant Ruksana Diwan operated a patch telephone system at a St. Petersburg address in order to conceal the fact that the Defendant Mervyn Harold Cross was originating the telephone calls while incarcerated in the Florida State Prison System.

4. It was further a part of said scheme and artifice to defraud that the Defendants Mervyn Harold Cross and Ruksana Diwan contacted a talent agency and falsely stated that they were looking for pre-adolescent females to act in a legitimate production known as "Susan's Magic Carpet." They requested that the talent agency send them photographs of pre-adolescent females so the Defendant Mervyn Harold Cross could select from these photographs the minors he wished to consider for a starring role in his production.

5. It was further a part of said scheme and artifice to defraud that the Defendants Mervyn Harold Cross and Ruksana Diwan represented to the talent agency as well as to the parents of the pre-adolescent girls that they would have to travel to such countries as Japan and Finland, as well as other countries, and that some nude sequences would be required in order to accurately depict life in those countries.

6. It was further a part of said scheme and artifice to defraud that the parents of the children were told that the girl or girls selected could achieve stardom and financial success.

7. It was further a part of said scheme and artifice to defraud that the Defendants Mervyn Harold Cross and Ruksana Diwan would enlist a commercial photographer to take photographs of the children both clothed and unclothed.

8. It was further a part of said scheme and artifice to defraud that the Defendants never intended to produce a legitimate movie or television documentary entitled "Susan's Magic Carpet" nor did they intend for the children to be legitimate "stars" nor did they intend for the children to gain financial success from this venture. The true nature of the venture was to use the pre-adolescent females for the personal gratification of

one or more of the defendants as well as others both known and unknown to the grand jury. The personal gratification would either be gained directly from the females or from photographs taken of the pre-adolescent females.

9. It was further a part of said scheme and artifice to defraud that the Defendant Mervyn Harold Cross in order to conduct this scheme and artifice to defraud used "legal mail" to receive and distribute correspondence while in prison through the good offices of an attorney licensed to practice law in the State of Florida.

10. It was further a part of said scheme and artifice to defraud that the Defendant Mervyn Harold Cross in order to conduct his scheme and artifice to defraud used corporation names and fictitious names.

11. To effectuate the aforesaid scheme and artifice to defraud the Defendants Mervyn Harold Cross, Robert Carter Lodge and Ruksana Diwan did knowingly and wilfully cause to be delivered by mail according to the direction thereon the following writings on or about the dates alleged, each writing constituting a separate count of this indictment.

Thereafter, the indictment describes eighteen writings, each of which the defendants are alleged to have caused to be mailed.

Although there is no doubt that the indictment could have been written with more certainty and exactitude, it does not necessarily follow that reversible error has been committed. *See United States v. Guthartz,* 573 F.2d 225, 227 (5th Cir.1978).[4] When read and considered as a whole, *see Dunbar v. United States,* 156 U.S. 185, 190, 15 S.Ct. 325, 327, 39 L.Ed. 390 (1895), the indictment is sufficient to withstand Diwan's *McNally* challenge since it adequately alleges that Diwan and her cohorts schemed to deprive the intended victims of the fraud, the girls, the talent agency, and the photographer, of property and money.

That the indictment is not specific does not render it insufficient, for "the law does not compel a ritual of words." *United States v. Purvis,* 580 F.2d 853, 857 (5th Cir.1978). Rather, the indictment must, first, recite the elements of the offense and fairly inform the defendant of the charge against her; and, second, enable her to plead an acquittal or conviction in bar of any future prosecution for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citations omitted). Diwan, through her *McNally* challenge, asserts that a necessary element of the mail fraud offense, that the purpose of the scheme was to cause a deprivation of money or property, was omitted by the authors of the indictment.

However, we believe that the indictment sufficiently sets forth the deprivations that would be necessary consequences of the scheme, and each planned deprivation involves something other than the intangible sort of right described in *McNally.* One objective of this conspiracy, so the indictment alleges, was that the girls forfeit modelling services, photographs, and the likenesses that emanate therefrom. The photographer would lose the value of his services, as would the Burn's Talent Agency; it was not a part of the conspiracy that they receive compensation for their efforts. Moreover, the photographer would necessarily have to use film and other materials in producing the photographs, and Burn's would forfeit proprietary business information—the identities and the addresses of aspiring actresses. All of these items have value to the owner, and could be fraudulently taken.

Diwan misses the point when she argues that the primary objective of the scheme, according to the indictment, was merely personal sexual indulgence, and not the deprivation of property through fraud. The entire array of deprivations announced in the indictment would be a necessary result of the overt acts planned to further

---

**4.** This court has adopted as precedent those decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of*

*Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*).

the scheme. If the defendants were to achieve success in their endeavor in the chosen manner, the girls, the photographer, and the talent agency would have to lose, and what they would lose is property. Diwan's interpretation of the indictment is too narrow.

### III.

Challenging the judgment of conviction entered on count I of the indictment, the only relevant count charging an offense other than mail fraud, Diwan asserts as her second issue on appeal that the district court lacked personal jurisdiction to convict her of conspiring to persuade a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct. The genesis of this jurisdictional argument was Diwan's flight and subsequent extradition.

On the eve of trial, Diwan, loathing the prospect of prosecution, fled the United States and sought asylum in the United Kingdom. The district court issued a bench warrant for her arrest; subsequently, the United States requested extradition pursuant to the terms of the reciprocal treaty on that subject, and Diwan was apprehended by British authorities.

■ Thereafter, Diwan was brought before the Bow Street Magistrates' Court in London, which convened to determine whether the evidence would justify committal for trial in England if the offenses with which Diwan was charged had been committed there. The United States argued that the conspiracy alleged in Count I of the indictment stated four violations of the Protection of Children Act promulgated by Parliament in 1978, and that the offense of mail fraud is analogous to the crime of theft. Following an evidentiary hearing, the magistrate determined that the photographs presented were not indecent as that term is defined in the Protection of Children Act and dismissed that portion of the

United States' argument. However, he concluded further that the evidence presented did prove acts prohibited by the British Theft Act, and, accordingly, committed Diwan to prison for the purpose of extradition. The Secretary of State for the Home Office thereafter issued a warrant ordering that Diwan be surrendered to the United States.

Diwan, having been so returned to the middle district of Florida, continued to vigorously contest prosecution, but now within the judicial process. Through an action seeking the writ of habeas corpus, a motion to dismiss the indictment, and two motions in limine, she advanced the argument that prosecution on count I was barred by Article XII of the extradition treaty between the United States and Great Britain.[5] This provision of the treaty embodies the specialty doctrine, a rule of law designed to preserve international relationships and protect the institution of extradition. *See, e.g., United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.1986). Under this doctrine, the petitioning country may prosecute only those offenses for which the accused was originally extradited. *United States v. Rauscher*, 119 U.S. 407, 429–30, 7 S.Ct. 234, 245–46, 30 L.Ed. 425 (1886). Diwan avers that those offenses for which she was extradited did not include Count I since the English magistrate had detained her only on the theft-related offenses.

In response, the government submitted certain correspondence between the two nations that it asserts renders Diwan powerless to advance that argument. The United States Justice Department, through its Director of the Office of International Affairs—Criminal Division, requested that the Secretary of State for the Home Office confirm that Great Britain did not object to the prosecution of Diwan on all of the nineteen counts in the indictment in which she was named. The Home Office, following a brief discussion of the magistrate's decision, concluded its letter in response with the following paragraph:

---

5. Article XII provides in pertinent part:

A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in

respect of which his extradition has been granted. . . .

Extradition Treaty, June 8, 1972, United States —Great Britain, 28 U.S.T. 227, T.I.A.S. No. 8468.

I can therefore confirm your understanding of that decision and of the surrender warrant subsequently signed by the Secretary of State. Accordingly, with reference to the provisions of the Extradition Treaty, and in particular Article XII, I am able to confirm that the United Kingdom has no objection to the indictment of Ms. Diwan as proposed.

In determining whether the prosecution of Diwan was a breach of the extradition treaty, it is essential that we determine whether Great Britain would regard the prosecution as an affront to its sovereignty, for the remedy which Diwan seeks, and the arguments that she advances in support thereof, are derivative in nature. In *Rauscher*, the precedent on which Diwan relies, the Supreme Court fashioned a remedy for the accused threatened with prosecution for offenses other than those for which extradition had been granted. *Rauscher*, 119 U.S. at 430–31, 7 S.Ct. at 246. However, the objective of the rule is to insure that the treaty is faithfully observed by the contracting parties. *Id.* at 430, 7 S.Ct. at 246; *see Fiocconi v. Attorney General*, 462 F.2d 475, 480 (2d Cir. 1972). The extradited individual, therefore, can raise only those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty. *See Najohn*, 785 F.2d at 1422; *Fiocconi*, 462 F.2d at 479–80; *Greene v. United States*, 154 F. 401, 409 (5th Cir. 1907). Therein lies the demerit of Diwan's argument.

As the correspondence between the sovereigns unequivocally denotes, Great Britain does not regard the prosecution of Diwan on the conspiracy count of the indictment as a breach of the extradition treaty. That this is true could not be more vivid. The Home Secretary, who according to English constitutional and statutory law is to determine ultimately whether or not the accused is to be sent abroad for trial,[6] *In re Castioni*, 1 Q.B. 149, 163–64 (1890) (Hawkins, J.); The Extradition Act, 1870, 33 & 34 Vice., ch. 52, § 11, confirmed that the surrender warrant, which was drafted at his direction, authorized the prosecution of Diwan on all counts, including the conspiracy count. Diwan's interpretation to the contrary is not relevant.[7]

AFFIRMED.

---

**6.** Diwan asserts, without citation, that it is the magistrate at Bow Street that finally determines whether extradition should be allowed, and that the Justice Department's request for clarification of the surrender warrant should have been addressed to the Foreign Office rather than the Home Office. Both of these assertions are contrary to English statutory law as interpreted by the courts of England. The Extradition Act of 1870, which sets forth the procedures to be followed when a request for extradition is received, is clear in its delegation of authority. Initially, the magistrate determines whether the accused should be committed to prison to await extradition, which he must do if such evidence is produced as would prove that the acts of the accused are violative of English criminal law. The Extradition Act, 1870, 33 & 34 Vice., ch. 52, § 10. Thereafter, the Secretary of State for the Home Office may issue a warrant ordering that the fugitive be surrendered to the requesting country. The Extradition Act, 1870, 33 & 34 Vice., ch. 52, § 11. The Home Office, therefore, has the ultimate authority. *In re Castioni*, 1 Q.B. 149, 162–63 (1890) (Hawkins, J.).

**7.** Based on the foregoing reasoning, we also reject Diwan's terse argument that her extradition violates the international law concept of double criminality.