## *In re* MAHON.

### (*District Court, D. Kentucky.* March 3, 1888.)

1. EXTRADITION—INTERSTATE—ARREST AND BRINGING INTO JURISDICTION BY PRIVATE PARTIES.

    On a petition for *habeas corpus*, where it appears that the petitioner, being charged with crime in one state, had fled to another, where he was arrested by a private party without authority, and that the authorities of the latter state had not acted upon a requisition of the executive of the former, the district court will not revise the arrest as being an effort to act under Const. U. S. art. 4, § 2, providing for interstate extradition of persons charged with crime, and laws passed thereunder.

2. SAME—PRIVILEGES OF CITIZENS—FOURTEENTH AMENDMENT.

    A lawful arrest, under authority of a state court, of one unlawfully brought into the state by private parties, is not a violation of the fourteenth amendment to Const. U. S., providing that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

3. SAME—DUE PROCESS OF LAW.

    In the fourteenth amendment to Const. U. S., providing that no state shall "deprive any person of life, liberty, or property, without due process of law," the phrase "due process of law" refers to the state's own process, and a lawful arrest under authority of a state court of one unlawfully brought into the state by private parties, is not a violation of the provision.

Petition for writ of *Habeas Corpus*, by Plyant Mahon.

Abner Justice, jailer of Pike county, having made his return to the writ of *habeas corpus* issued herein on the ———— day of February, 1888, and Plyant Mahon having filed his response thereto, and produced evidence, the court certifies the following to be the facts as admitted by the parties or proven to the court's satisfaction, viz.: The petitioner, Mahon, together with 19 other persons, was, at the September term, 1882, of the circuit court of Pike county, Ky., indicted by the grand jury impaneled in and by said court, for willful murder, alleged to have been committed by them in said county. Mahon was at the time, and had

always been, and still is, a citizen of West Virginia, and a resident of Logan county in said state. His excellency, S. B. Buckner, governor of the state of Kentucky, on the 10th day of September, 1887, made upon his excellency, E. W. Wilson, governor of the state of West Virginia, a requisition under the seal of the commonwealth, demanding of him, the governor of West Virginia, the arrest and rendition of the said Plyant Mahon, and the others named in said indictment, to the state of Kentucky, to answer the same, claiming that the said Plyant Mahon and others had fled as fugitives from justice from said state. Said requisition was accompanied by a copy of the indictment therein referred to, which was certified by the governer of Kentucky to be authentic. In said requisition he appointed one Frank Phillips agent of the state of Kentucky, to receive said Mahon and the others, and bring them to the state of Kentucky. This requisition was not acted upon by the governor of West Virginia, because, as he stated, of the want of an affidavit in conformity with the laws of West Virginia. An affidavit was then made by said Frank Phillips in compliance with said request, and on the 13th of October, 1887, was sent by his excellency, Gov. Buckner, to his excellency, Gov. Wilson. There was no further correspondence between the said governors in regard to said requisition, until the 9th of January, 1888. In the mean time, the Hon. Henry J. Walker, secretary of state of West Virginia, by letter dated November 21, 1887, wrote to P. A. Cline, who was deputy-jailer of Pike county, in reply to a letter of inquiry from him, and notified him that the said requisition of the governor of Kentucky would be honored, except as to Elias Hatfield and Andrew Varney, and that warrants would be issued for their arrest upon the receipt of $54, his fees for issuing the same. The reason given for not issuing warrants for Elias Hatfield and Andrew Varney was because they were not guilty, in the governor's opinion, from the evidence which had been presented to him. Subsequently, by letter dated December 13, 1887, Frank Phillips, the person appointed as agent aforesaid, wrote to his excellency, Gov. Wilson, inclosing $15 to pay fees of the secretary of state, and requesting he should issue his warrants for the arrest of Anderson Hatfield, Johnson Hatfield, Capt. Hatfield, Daniel Whitt, and Andrew McCoy, and he sent these warrants to him (Phillips) at Pikeville. This money ($15) was returned to Phillips, and the order for the warrants countermanded by Gov. Wilson, because, as he states, from information subsequently obtained he believed the requisition and expected warrants would be used, not to secure public justice, but to extort money from the accused. His excellency, Gov. Buckner, on the 9th day of January, 1888, wrote to his excellency, Gov. Wilson, a letter of inquiry in regard to his action under the requisition. This letter of inquiry was replied to January 21, 1888, by Gov. Wilson. No warrants had been issued by the governor of West Virginia for the arrest of any person mentioned in the said requisitions on the 9th of January, or before or since that time. Frank Phillips, with 25 or 30 armed men, went from Kentucky across into West Virginia, and with force and arms arrested the petitioner, Plyant Mahon, on January 9, 1888, and against his will and

by force brought him to the town of Pikeville in the state of Kentucky, and on the 11th of January, 1888, placed him in the jail of Pike county in said town, which was then in charge of Abner Justice, jailer of said county; and on the next day, January 12, 1888, while thus confined in said jail in said town, he was served with a bench-warrant, and arrested by the deputy-sheriff of said county. The bench-warrant under which he was arrested was issued from the clerk's office of the criminal court of Pike county, which court then had jurisdiction to issue bench-warrants, and try persons charged under the aforesaid indictments. When he was arrested, Phillips was asked by Mahon by what authority he did so, and he said he was state's agent to arrest him, and take him to "Pike," and that he was authorized by the governor of West Virginia to make the arrest. His excellency, Gov. Wilson, did, under seal of West Virginia, demand of his excellency, Gov. Buckner, the surrender and return to the state of West Virginia of the said Mahon, and the others who had been seized by force and arms and carried away to Pike county by said Phillips and others, which request was declined by his excellency, Gov. Buckner, on the 4th of February, 1888.

*U. Gibson* and *J. H. Sinclair*, for petitioner.

*P. W. Hardin*, Atty. Gen., and *J. Proctor Knott*, for respondent.

BARR, J., (*orally, after stating the facts as above.*) The question presented to the court under this writ of *habeas corpus* is much narrower than the discussion of counsel would indicate. It is now settled that the courts of the United States recognize the treaty obligation between the United States and other nations in regard to the extradition of fugitives from justice. In a recent case, the supreme court recognized the provisions in regard to extradition, in the treaty known as the "Ashburton Treaty" between the United States and Great Britain, and decided that a person extradited under that treaty could only be tried for the crime for which he had been extradited. This was not because of the comity which should exist as between nations, nor because the law of nations would have been violated, but because of the terms of the treaty, and the act of congress made to carry out treaty obligations in the matter of extradition of fugitives from justice. *U. S.* v. *Rauscher*, 119 U. S. 407, 7 Sup. Ct. Rep. 234. It is also settled that there is not a personal right of asylum in a refugee, who has fled from this country, being charged with crime, to a foreign country. Thus, if there be no treaty authorizing extradition, or if the fugitive from justice is not brought back from a foreign country under and according to the provisions of the treaty, if there be one, then the courts will not allow the fugitive to plead the mode of his capture and return to this country as an answer to his crime or in abatement to the indictment against him. *Ker* v. *Illinois*, 119 U. S. 437; 7 Sup. Ct. Rep. 225; 110 Ill. 630; *State* v. *Brewster*, 7 Vt. 118.

As to a person charged with crime in one of the states of this Union, and who has fled to another state, there is some difference in the reasoning of the courts; but I think all of the American authorities concur in the

conclusion, that the refugee, under such circumstances, has not a personal right of asylum in the state to which he has fled. They agree that the refugee, when returned to the state wherein he committed the crime, by whatever means he may have been returned, cannot plead as an answer to his crime the manner of his return, and that he had not been extradited according to and under the law. *State* v. *Smith*, 1 Bailey, 283; *State* v. *Ross*, 21 Iowa, 467; *In re Noyes*, 17 Alb. Law J. 407; *Dows' Case*, 18 Pa. St. 37. In *Dows' Case*, a great jurist, Chief Justice GIBSON, made an important statement, though it was not necessary in the discussion of the case, and that was, that although a refugee from justice, who is brought to the state where he is charged to have committed the crime, from the state to which he had fled, has not of himself the right of asylum, if the chief executive of the state from which he has been brought by unlawful means demands his return, he should be discharged under a writ of *habeas corpus*. This is because of the sovereignty which still exists in the states of this Union, and the comity which should exist between them. This court cannot, however, consider what is or should be the law of comity between the states of this Union, because, by the express language of the act under which this *habeas corpus* was issued, this court is confined to the inquiry whether the petitioner is detained in custody by the jailer of Pike county in violation of the constitution or laws of the United States; nor can this court consider any controversy, if there be one, between the state of West Virginia and the state of Kentucky. All such controversies are within the exclusive jurisdiction of the supreme court.

The right to extradite a refugee, who is charged with crime in one state and has fled to another state of this Union, is governed by the second section, art. 4, Const., which provides:

"A person charged in any state with treason, felony, or other crimes, who who shall flee from justice, and be found in another state shall, on demand of the executive authority of the state from which he has fled, be delivered up to be removed to the state having jurisdiction of the crime."

Congress has enacted laws to carry out this provision of the constitution, and it is settled that both state and federal courts may, under a writ of *habeas corpus*, revise the action of the governor of a state upon whom a requisition is made if he acts, and has the refugee arrested, to see that the constitution and the act of congress have been complied with. The courts, however, cannot, by any process known to the law, compel a governor upon such a requisition, to act and have the refugee arrested and delivered over. *Kentucky* v. *Dennison*, 24 How. 66. It is claimed that the petitioner is detained in violation of the constitution of the United States, and this court should discharge him. And it is argued that the only process by which he could have been extradited was the process provided by the constitution of the United States, and the laws made thereunder, and that in this case this process has been invoked in so far as to give this court jurisdiction to revise the action taken under it. It is quite clear, as will be seen from the statement of facts already read, that there was no action taken by the authorities of West Virginia

under the *requisition* made by the governor of Kentucky. Phillips, though designated by the governor of Kentucky as the agent to receive from the proper authority of West Virginia the petitioner and others, and bring them to Kentucky, never in fact acted as the agent of the state of Kentucky. It is true, he represented himself to the petitioner as having authority from the governor of West Virginia to arrest him, and as being the agent of the state of Kentucky, but that was false. The governor of West Virginia never issued a warrant for the arrest of petitioner, nor had Phillips any authority to do so, either from the governor of West Virginia or the governor of Kentucky, or any one else. The process by which a lawful extradition could be made was never used; nor did Phillips act under color of authority, and hence this court cannot revise his action as being an effort to act under the provisions of the constitution and laws of the United States.

This brings us to consider the other proposition, which is that since the adoption of the fourteenth amendment to the constitution of the United States neither a resident or citizen of one state having been charged with crime in another state, and having fled therefrom, can be extradited from that state, except by the due process of law which is provided in the federal constitution; and the laws made thereunder, and unless he is thus extradited, he is within the protection of that amendment. It is true, I think, that the only legal mode of arresting a refugee from justice under such circumstances is under and according to the constitution of the United States, and the laws made thereunder, and such state laws as may be constitutionally made in aid thereof. This being true, it may be insisted that due process of law, as required by that amendment, when a refugee from justice has fled from the state where he is charged with crime to another state, is—*First*, the mode of extradition as provided by the federal constitution, and the laws thereunder; *second*, after he is returned to the state from which he has fled, his arrest under and in accordance with the regular and lawful process of that state. Hence, as he was not extradited according to or under the process provided by the constitution and laws, but by force and against his will, he is now deprived of his liberty by the state of Kentucky without due process of law within the meaning of this amendment. That amendment declares, among other declarations that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law." It will be observed that this is not a grant to the citizen resident, or sojourner, as an individual, of any right which he did not theretofore have, but it is a limitation upon the power of the states, put in the federal constitution. It is not a declaration of what privileges or immunities citizens of the United States are entitled to, but is a declaration that no state of the Union shall abridge them. The previous part of the section which declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside," created a national citizenship, but does

not declare or define the privileges, rights, or immunities of a citizen of the United States. These rights, privileges, and immunities are assumed to exist from the relation of national citizenship, and have not yet been clearly defined by the courts, but whatever they may be, and however they may be extended to rights and privileges which are national in their nature, and beyond what theretofore existed from the relation of state citizenship, I think national citizenship would not confer upon a refugee who has fled from a state in which he is charged with crime to another state, the right of asylum in said state. We have seen that no such individual right of asylum exists because of state citizenship, and if it existed at all, it would be because of the sovereignty which still remains in the states. There is no reason why a national citizenship should confer the right of asylum which could arise and exist in a state of this Union only because of a reserved sovereignty in the state. It is true that a citizen of a state and of the United States both before and since the adoption of the fourteenth amendment to the constitution is entitled to be extradited under and according to the constitution and laws of the United States, and that he was and is entitled to a writ of *habeas corpus*, and to his release, when deprived of his liberty by force, and not in accordance with the provisions of the laws regulating extradition. Before the adoption of this amendment and the act of 1867, the state courts alone could issue a writ of *habeas corpus* in favor of one seized by force, and without any process of law. But since that time the federal courts as well as the state courts would perhaps have jurisdiction in such cases because of the second section of article 4 of the constitution, and laws made thereunder, and the national citizenship of the person forcibly seized and held in custody. The writ of *habeas corpus*, whether issued from a state or federal court would have no extraterritorial force, and neither court could discharge a person, although originally unlawfully seized, who had been legally arrested, and was then held by due process of law, unless a state court should, as Chief Justice GIBSON indicates, release as a matter of comity between the states, the fugitive from justice upon the demand of the governor of the state from which he had been kidnapped. We therefore conclude that Kentucky has not abridged the privileges and immunities of the petitioner as a citizen of the United States by arresting him under a bench-warrant, after he was within the state.

The next inquiry is, has the state of Kentucky deprived him of his liberty without due process of law, within the meaning of this amendment. The petitioner had been indicted by a grand jury for willful murder, and was arrested in this state under and by the usual and regular process which has existed in this state from time immemorial for the arrest of persons indicted for crime by a grand jury. He is held by due process of law, if the inhibition of the fourteenth amendment is to be limited to the process of the state which deprives him of his liberty. If, however, the phrase "due process of law," is to include the means by which others brought him into this state, then it is not due process of law. Clearly, the prohibition is upon "any state," and we think the

" due process of law" which is required to be used by the state is its own process, and not the process of another state or the process of the United States. The supreme court has declined to define or attempt to define the meaning of "due process of law," and has wisely left its meaning to be ascertained by a "gradual process of judicial inclusion and exclusion." This case does not, however, require that we shall attempt to define it, because there can be no doubt the Kentucky process by which the petitioner was arrested after he was brought into the state, was "due process of law," so far as the process of that state is concerned. If, therefore we are correct in construing this part of the fourteenth amendment as meaning that the prohibition is confined to "a state," and that the "due process of law," which is required to be used before any person can be deprived of his life, liberty, or property by a state, is the due process of that state, then the petitioner's arrest and detention in the jail of Pike county is not a violation of this provision of the fourteenth amendment of the constitution of the United States. The fifth amendment to the constitution of the United States declared that "no person shall be * * * deprived of life, liberty, or property without due process of law." The uniform construction of this amendment is that the United States shall not deprive any person of life, liberty, or property without due process of law, and that the process which is meant is a federal process. Indeed, the form and character of the government precludes any other construction. When this question was first presented, I was inclined to the opinion that "due process of law" in the meaning of the fourteenth amendment required the petitioner's extradition from West Virginia by a legal process, as well as his legal arrest after he was in Kentucky; but a more critical examination has satisfied me that this amendment has not been violated by the state of Kentucky in thus arresting and detaining the petitioner in the jail of Pike county. The petitioner must therefore be remanded to the custody of the jailer of Pike county, and it will be so ordered.