## COHN v. JONES, Warden.

### (District Court, S. D. Iowa, C. D. April 3, 1900.)

1. HABEAS CORPUS—FEDERAL COURTS—RELEASE OF STATE PRISONER.

   A federal court may, in its discretion, release upon a writ of habeas corpus a person held in confinement under a judgment of a state court sentencing him to imprisonment for crime, where it appears that such court had no jurisdiction over his person or of the crime charged; and where such want of jurisdiction arises from a provision of the constitution or a law or a treaty of the United States which precludes a second prosecution for the offense, such relief may properly be granted, rather than to compel the petitioner to follow his remedy by writ of error.[1]

2. EXTRADITION—TRIAL OF ACCUSED FOR DIFFERENT OFFENSE—IDENTITY OF CHARGES.

   The information upon which extradition papers were based charged the defendant with the burning of a "house" owned by a person named, and "occupied and inhabited" by persons named for specified business purposes. The indictment found against the defendant after his extradition, and upon which he was tried, charged him with the burning of a "store building" owned and occupied by the same persons, and for the same purposes, as specified in the information. *Held*, that the word "house," as used in the information, could not be considered as meaning a dwelling house, but must be construed in connection with the other averments, which clearly showed it to be a store building, and that, therefore, there was no variance between the charge upon which the defendant was extradited, and the one for which he was tried.

3. SAME—CONSTRUCTION OF TREATIES—DESCRIPTION OF OFFENSES.

   Where an extradition treaty uses general names, such as "murder" or "arson," in defining the classes of crimes for which extradition may be granted, such names are not necessarily confined to their meaning at common law, but the question whether a given offense comes within the treaty must be determined by the law as it exists in the two countries at the time the extradition is applied for.

4. SAME—OFFENSES EMBRACED IN TREATY—DUTY OF DETERMINATION.

   Under the Ashburton treaty between Great Britain and the United States, signed August 9, 1842, which provides (article 10) that a person can be surrendered for trial on extradition proceedings only "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime had been there committed," and further provides for the examination into the charge by a judge or magistrate of such place, it is the duty of the authorities of the country upon which demand for extradition is made to determine in the final instance whether the facts set forth in the information or other papers charge the commission of an offense within the provisions of the treaty, and, in the absence of fraud practiced upon them, their decision cannot be questioned.

On petition praying the issuance of a writ of habeas corpus on behalf of petitioner, and demurrer thereto filed by respondent.

Charles L. Powell, for petitioner.

Milton Remley, Atty. Gen., and John McLennan, Co. Atty., for defendant.

SHIRAS, District Judge. From the petition and the amendment thereto filed in this case it appears that the petitioner, Charles

[1] As to jurisdiction of federal courts on habeas corpus, see note to In re Huse, 25 C. C. A. 4.

Cohn, is now confined in the Iowa state penitentiary at Ft. Madison under a sentence pronounced by the district court of Iowa for Polk county, he having been found guilty of the crime of burning a store building situated in Polk county, Iowa. It further appears that, in order to subject the petitioner to the jurisdiction of the district court of Polk county, and put him upon trial, it became necessary to extradite the petitioner from Canada, and to that end an information, duly sworn to, was laid before John J. Halloran, a justice of the peace in Des Moines township, Polk county, and a warrant of arrest was issued thereon. Based upon these proceedings, an application in due form, through the president of the United States, was made to the Canadian authorities for the extradition of the petitioner under the terms of the treaty between Great Britain and the United States, known as the "Ashburton Treaty," signed August 9, 1842, and the supplementary convention of March 25, 1890 (26 Stat. 1508). The order of extradition having been given by the Canadian authorities, the petitioner was brought back to Iowa, and, an indictment being found against him in the district court of Polk county, he was put upon trial before a jury, convicted, and sentenced to imprisonment for the period of eight years in the state penitentiary. He now seeks to obtain a release from this imprisonment on the ground that he was indicted, tried, and found guilty of an offense other and different from that for which he was extradited; that it is settled by the decision of the supreme court of the United States in the case of U. S. v. Rauscher, 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425, as well as by the express provisions of the supplementary convention of March 25, 1890, that a person extradited under the treaties between Great Britain and the United States can be tried only for the offense charged against him in the extradition proceedings, the court being without jurisdiction to put him upon trial for any other crime. By article 111 of the convention of March 25, 1890, it is declared that:

"No person surrendered by or to either of the high contracting parties shall be liable or be tried for any crime or offense, committed prior to his extradition, other than the offense for which he was surrendered, until he shall have had an opportunity of returning to the country from which he was surrendered."

Prior to the adoption of the supplementary convention of 1890, the supreme court, in an opinion handed down December 6, 1886, in the case of U. S. v. Rauscher, 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425, had considered this general question in a case arising under the Ashburton treaty, and held the rule to be that a person extradited "shall be tried only for the offense for which he is charged in the extradition proceedings, and for which he was delivered up; and that, if not tried for that, or after trial and acquittal, he shall have a reasonable time to leave the country before he is arrested upon the charge of any other crime committed previous to his extradition." The ruling in this case, and the provisions of article 111 of the convention of 1890, clearly sustain the contention of petitioner that a person extradited cannot be rightfully placed upon trial for any offense other than that with which he was charged

in the extradition proceedings, and therefore the main question for consideration is whether in fact the petitioner was tried and convicted for an offense other than that for which he was surrendered by the Canadian authorities. When placed upon trial in the state court, the petitioner in that court presented this question, denying the jurisdiction of that court to try him for the crime charged in the indictment to which he was required to plead; but the court overruled the objection, and it is now strenuously urged in argument by the attorney general, appearing for the respondent, that the remedy open to the petitioner is by an appeal from the ruling of the trial court to the supreme court of the state, and from thence, if need arises, to the supreme court of the United States. It is well settled that a writ of habeas corpus must not be used to serve the purposes of a writ of error, but it is equally well settled that the writ may be granted in cases wherein it appears that the state court had no jurisdiction over the person of the defendant, or of the crime charged in the proceedings before it. Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717; Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; In re Frederich, 149 U. S. 70, 13 Sup. Ct. 793, 37 L. Ed. 653. These cases, and others that might be cited, declare the rule to be that in cases wherein the trial court, whether state or federal, has jurisdiction over the person and the crime charged in the proceedings, relief against alleged errors can only be had by a writ of error; but in cases wherein it is alleged that the trial court is without jurisdiction over the person of the defendant or over the crime charged, then the writ of habeas corpus may be availed of, it being then discretionary with the court or judge from which the writ is sought to determine whether the party complaining should be left to seek his remedy by a writ of error, or whether the circumstances are such as to justify granting relief through the issuance of the writ of habeas corpus. In the opinion given in Re Frederich, supra, it is said:

"It is certainly the better practice, in cases of this kind, to put the prisoner to his remedy by writ of error from this court, under section 709 of the Revised Statutes, than to award him a writ of habeas corpus. For under proceedings by writ of error the validity of the judgment against him can be called in question, and the federal court left in a position to correct the wrong, if any, and at the same time leave the state authorities in a position to deal with him thereafter, within the limits of proper authority, instead of discharging him by habeas corpus proceedings, and thereby depriving the state of the opportunity of asserting further jurisdiction over his person in respect to the crime with which he is charged."

In cases, however, in which the facts are such that the state court is without jurisdiction, and cannot rightfully proceed against the party, the supreme court has originally entertained proceedings in habeas corpus, and has affirmed the action of the trial courts in granting relief in that mode of procedure. In re Loney, 134 U. S. 372, 10 Sup. Ct. 584, 33 L. Ed. 949; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55; Ohio v. Thomas, 173 U. S. 276, 19 Sup. Ct. 453, 43 L. Ed. 699. If it be true that the petitioner in this case was tried for an offense other and different from that for which he

100 F.—41

was surrendered by the Canadian authorities, then it is clear that the state court had not jurisdiction over his person, and the whole proceedings based upon the indictment are void, and of no effect. In the opinion delivered in U. S. v. Rauscher, supra, after demonstrating the proposition that under extradition treaties of the nature of that between Great Britain and the United States a person extradited can be tried only for an offense named in the treaty, and upon which the extradition proceedings were had, the court then proceeds to consider the remedy open to the party if he is wrongly put upon trial for an offense other than that for which he was extradited, stating its views as follows:

"This remedy is by a writ of error from the supreme court of the United States to the state court which may have committed the error. The case being thus removed into that court, the just effect and operation of the treaty upon the rights asserted by the prisoner would be there decided. If the party, however, is under arrest, and desires a more speedy remedy in order to secure his release, a writ of habeas corpus from one of the federal judges or federal courts, issued on the ground that he is restrained of his liberty in violation of the constitution or a law or a treaty of the United States, will bring him before a federal tribunal, where the truth of the allegation can be inquired into, and, if it be well founded, he will be discharged."

In Cosgrove v. Winney, 174 U. S. 64, 19 Sup. Ct. 598, 43 L. Ed. 897, the facts were that Cosgrove was charged with larceny of a boat and her appurtenances at Detroit, Mich., and was extradited from Canada under the Ashburton treaty, and was held to bail before the recorder's court in Detroit. He gave bail for his appearance, returned to Canada, and subsequently, but before the trial in the recorder's court, came back to Detroit, where he was arrested on the charge of obstructing the United States marshal in the execution of a writ of attachment. He applied to the district court of the United States for a writ of habeas corpus, in order to be released from this arrest, on the ground that he was protected by the terms of the treaty; and upon appeal the supreme court sustained the proceedings, and ordered his discharge.

These authorities, and others that might be cited, sustain the authority of the federal courts to grant writs of habeas corpus when it appears that the petitioner is restrained of his liberty in violation of a law or treaty of the United States, and it is an authority which should be exercised when the writ is sought on account of infractions of the treaties existing between the United States and other nations. In entering into extradition treaties, and in surrendering fugitives from justice under the terms thereof, the foreign nation must rely upon the good faith of the national government for the proper observance of their terms. If Great Britain, in pursuance of the treaty with the United States, and upon request of the president, surrenders a person for trial, either in a federal or state court, for some offense provided for in the treaty, such surrender is made upon the express condition that the person extradited will be tried only for the offense provided for in the extradition proceedings; but the only government to which Great Britain can look for the enforcement of this condition is that of the

United States, and hence the duty is placed upon the executive and judicial branches of the federal government to require a strict observance of the treaty obligations. It is for this reason that we find it enacted in section 5275 of the Revised Statutes that:

"Whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any crime of which he is duly accused, the president shall have power to take all necessary measures for the transportation and safekeeping of such accused person, and for his security against lawless violence, until the final conclusion of his trial for the crimes or offenses specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such crimes and offenses, and for a reasonable time thereafter, and may employ such portion of the land and naval forces of the United States, or the militia thereof, as may be necessary for the safekeeping and protection of the accused."

In the opinion of the court in the already cited case of U. S. v. Rauscher, supra, it is said, in effect, that the treaty obligation can, in most cases, be enforced with less friction through the judicial branch of the government than by means of the executive power; that being one of the reasons assigned for the ruling that a party prosecuted for an offense other than that covered by the extradition proceedings can apply for a writ of habeas corpus to a federal court or judge. In view of these rulings, and the reasons on which they are based, it must be held that the application in this case for a writ of habeas corpus is within the jurisdiction of this court, and the grounds upon which the application is founded, to wit, that the terms of the extradition treaty have been violated, are such that it becomes the duty of the court to examine into the truth of the allegation in order to prevent infractions of the treaty obligations due from the government of the United States to that of Great Britain. As already stated, the petitioner charges in his petition that he was extradited for one offense, and was tried, convicted, and sentenced for another and different offense, and the query is whether this allegation is sustained by the actual facts of the case. It may be here stated that the proceedings against the petitioner were begun in the name of Charles A. Spiegel, that being the name by which he was known in Des Moines; but upon arraignment to answer to the indictment found against him it appeared that his true name was Charles Cohn, and the subsequent proceedings were had against the petitioner as Charles Cohn. In the information laid before the justice of the peace, and which formed the basis of the extradition proceedings, it was alleged that:

"The defendant, Charles A. Spiegel, is accused of the crime of arson, committed as follows: Said defendant, Charles A. Spiegel, on the night of the 21st day of February, 1899, in Polk county, Iowa, did feloniously and willfully set fire to and burn and consume a certain two-story brick house then and there situated, and being the property of Charles H. Martin, and at said time occupied and inhabited by the Hub Shoe Company for carrying on a retail shoe business, and by Charles A. Spiegel, carrying on the business of making and selling fur goods, and by J. W. Kramer as a photographer's gallery, contrary to the statutes in such case made and provided, and against the peace and dignity of the state of Iowa."

In the indictment returned by the grand jury, and upon which the petitioner was tried and convicted, it is recited that:

"The grand jury of the county of Polk, in the state of Iowa, being legally impaneled, sworn, and charged, in the name and by the authority of the state of Iowa accuse Charles A. Spiegel of the crime of arson, committed as follows: The said Charles A. Spiegel, on the 21st day of February, A. D. 1899, in the county of Polk aforesaid, and state of Iowa, in the nighttime of said day, did willfully, feloniously, and maliciously set fire to and burn a certain store building then and there situated in Polk county, Iowa, then and there occupied by the Hub Shoe Company and by J. W. Cramer as a store building, and then and there owned by one C. H. Martin, with a willful, malicious, and felonious intent," etc.

The contention of petitioner is that the extradition treaty provides for the surrender of persons charged with arson; that in construing the treaty the word "arson" must be given its meaning at the common law; that at the common law arson means the burning of a dwelling house; that the information upon which petitioner was extradited charges the common-law crime of arson, in that it charges the burning of a house occupied and inhabited; that the indictment charges the burning of a store building, which is made an indictable offense by the statutes of Iowa, but which is not included in the crime of arson, as known to the common law. There can be no question that both the information and the indictment charge an offense against the statute law of Iowa, and that both refer to and describe the same act, to wit, the burning of a house or building owned by Charles H. Martin, and situated in Polk county, Iowa. While it may be true that the word "house," when used without a qualifying description, would be construed to mean a dwelling house, yet the context may show that it is used in a different sense; and in determining the offense charged in the information in this case we must look at the entire description therein contained, in order to ascertain the character of the building which it is alleged was burned. The same rule must be observed with respect to the use of the word "inhabited" in the information. The question is whether the use of these words compels the court to hold that the burning of a dwelling house is charged, when the entire description contained in the information shows that it charges the burning of a structure occupied for carrying on the retail shoe, fur, and photographer's business. It cannot be questioned that the word "house" is used in many other senses than that of a dwelling house, and it must be held that the information in this case does not charge the burning of a dwelling house, but does charge the burning of a house occupied for certain named business purposes. In the indictment the charge is of burning a certain store building occupied by the Hub Shoe Company and by J. W. Cramer as a store building, and it cannot be held that there is such a variance in the character ascribed to the building burned in the information and the indictment as to justify the holding that two different offenses are charged therein; but, on the contrary, it must be held that it is made to appear that the petitioner was put upon trial and convicted of the same offense charged in the information which was made the basis of the extradition proceedings.

But it may be urged that, if this is the proper construction of the information and indictment, it is then made to appear that petitioner was extradited for an offense not within the purview of the treaty; the contention of petitioner being that the word "arson," used in the treaty, must be held to include only such offenses as would be held to be arson at the common law, the argument being that it cannot be supposed that Great Britain intended to bind itself to surrender for trial all persons who might be accused of arson, under statutes subsequently enacted in the several states of the Union, which might, by legislative enactment, declare very trivial matters to be arson; and thus secure the extradition of persons charged with offenses which were not within the contemplation of the contracting governments when the treaty was entered into. I concur in the contention of counsel for petitioner that offenses not within the terms of the treaty when it was adopted cannot be brought within it by the legislative action alone of either the United States or of any of the constituent states of the Union; but the remedy is not in adopting the view contended for by petitioner, to wit, that the common-law definition of the crimes named in the treaty must be adopted, and that no other offense can be held to be within its provisions. When an extradition treaty uses general names, such as "murder," "arson," and the like, in defining the classes of crimes for which persons may be extradited, the question of whether a given offense comes within the treaty must be determined by the law as it exists in the two countries at the time the extradition is applied for. Thus, in article 10 of the Ashburton treaty, it is provided that a person can be surrendered for trial only "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found would justify his apprehension and commitment for trial if the crime had been there committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judge or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered." This article of the treaty makes it plain that in the present case it was the duty of the Canadian authorities to determine whether the facts set forth in the information and other papers charged the petitioner with an offense within the meaning of the treaty, the test being whether the facts stated and shown would constitute the offense of arson in the dominion of Canada; and, the decision being that the offense of arson was charged, the extradition warrant was granted. Under the terms of the treaty the duty of determining whether the charge made against petitioner came within the provisions of the treaty was laid upon the Canadian authorities, and, in the absence of fraud practiced on them, their decision cannot be questioned. In substance, this same question was considered by the circuit court of appeals for this circuit in the case entitled In re Rowe, 23 C. C. A. 103, 77 Fed. 161. In that case it appeared that Chester W. Rowe had been extradited by the government of Mexico

under a treaty substantially similar to the one now under consideration, and he applied to the circuit court of the United States in the Southern district of Iowa for a writ of habeas corpus on the ground that he was held for trial upon an indictment charging an offense other than the one for which he was surrendered. The circuit court refused the writ, and on appeal the court of appeals affirmed the ruling holding that it was for the Mexican government to decide whether, under its laws, the facts shown in aid of extradition proceedings would constitute a crime within the terms of the treaty. Thus it is made clear that the authorities of both governments must concur in the conclusion that a given offense is included in the crimes named in the treaty, before a warrant of extradition will be issued. A demand for extradition will not be made unless the authorities of the country requesting it are satisfied, from the papers and evidence submitted, that the offense for which extradition is sought is one that, as the law then is in the demanding country, will be fairly embraced within the terms of the treaty; and the authorities of the country from which the surrender is sought are not authorized to grant the warrant of extradition unless upon examination it appears that the offense upon which the application is based is one which, under the law then existing in that country, would come within the extraditable crimes named in the treaty. Whether the Canadian authorities acted rightly in granting the order of extradition does not, therefore, depend upon the question whether the evidence submitted to them would sustain a charge of arson at the common law, but whether it would sustain a charge of arson under the law of the dominion of Canada as that law was at the time the order of extradition was sought. This question was determined in the affirmative by the Canadian authorities, and the order of extradition was granted, and the petitioner wholly fails to show any just ground for complaint against this action on their part. Under these circumstances it must be held that the facts averred in the petition and the amendment thereto do not constitute cause for the issuance of a writ of habeas corpus, and the prayer therefor is refused.